**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LOOMIS SAYLES TRUST COMPANY, LLC,
Individually and on behalf of all others similarly
situated,

                       Plaintiff,

v.

CITIGROUP GLOBAL MARKETS INC.

                       Defendant.

Civil Case No. 22-cv-6706-LGS

## <u>DEFENDANT CITIGROUP GLOBAL MARKETS INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF LOOMIS SAYLES TRUST COMPANY, LLC'S CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND......................................................................................................... 4

LEGAL STANDARD..................................................................................................................... 8

ARGUMENT .................................................................................................................................. 9

I.      THE MARCH 18 COMMUNICATIONS THAT COMPRISE LOOMIS'S
INSTRUCTIONS TO CGMI ARE PART OF THE PLEADINGS AND THE COURT
MAY CONSIDER THEM FOR PURPOSES OF THIS MOTION. ................................... 9

II.    THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE THAT CGMI BREACHED
EITHER A CONTRACTUAL OR FIDUCIARY DUTY OF "BEST EXECUTION".....11

III.   THE COMPLAINT SHOULD BE DISMISSED FOR THE INDEPENDENT REASON
THAT LSTC'S CLAIMS ARE PRECLUDED BY SLUSA.............................................20

IV.   ALTERNATIVELY, LSTC'S FIDUCIARY DUTY CLAIM SHOULD BE DISMISSED
AS DUPLICATIVE OF ITS CONTRACT CLAIM. .......................................................24

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*,
328 F. Supp. 3d 141 (S.D.N.Y. 2018)................................................................24, 25

*Anwar v. Fairfield Greenwich Ltd.*,
151 F. Supp. 3d 390 (S.D.N.Y. 2015)......................................................................23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................8, 9

*Barbara v. MarineMax, Inc.*,
No. 12-CV-0368 ARR, 2012 WL 6025604 (E.D.N.Y. Dec. 4, 2012)....................25

*In re Beacon Assocs. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010)................................................................19, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................................9

*Broder v. Cablevision Sys. Corp.*,
418 F.3d 187 (2005)................................................................................................10, 11

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)........................................................................................9

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
747 F.3d 145 (2d Cir. 2014).........................................................................................9

*Fisher v. Kanas*,
288 F. App'x 721 (2d Cir. 2008) ...............................................................................20

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)...........................................................................8

*Global Network Commc'ns, Inc. v. City of New York*,
458 F.3d 150 (2d Cir. 2006).....................................................................................9, 10

*Gurfein v. Ameritrade*,
312 F. App'x 410 (2d Cir. 2009) ................................................................................17

*Gwin v. Nat'l Life Ins. Co.*,
No. 2:08-CV-0059-RDP, 2008 WL 8945610 (N.D. Ala. Apr. 15, 2008)................23

*Helprin v. Harcourt, Inc.*,
277 F. Supp. 2d. 327 (S.D.N.Y. 2003) ................................................................4, 11

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991) ...................................................................................14

*Kurz v. Fidelity Mgmt & Research Co.*,
556, F.3d 639 (7th Cir. 2009) .................................................................................20

*Lewis v. Scottrade, Inc.*,
204 F. Supp. 3d 1064 (E.D. Mo. 2016), *aff'd*, 879 F.3d 850 (8th Cir. 2018) ...................21, 23

*Lim v. Charles Schwab & Co.*,
No. 15-CV-02074-RS, 2015 WL 7996475 (N.D. Cal. Dec. 7, 2015), *aff'd sub nom.*,
*Fleming v. Charles Schwab Corp.*, 878 F.3d 1146 (9th Cir. 2017) .........................................21

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006) .................................................................................................19

*Miller v. Metropolitan Life Insurance Company*,
2019 WL 4450637 (S.D.N.Y. Sept. 17, 2019) .................................................22, 23

*N. Shipping Funds I, LLC v. Icon Cap. Corp.*,
921 F. Supp. 2d 94 (S.D.N.Y. 2013) ................................................................24, 25

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith*,
135 F. 3d 266 (3d Cir. 1998) ..................................................................................17

*Olagues v. Perceptive Advisers LLC*,
No. 15-cv-1190 (AJN), 2016 WL 4742310 (S.D.N.Y. Sept. 9, 2016) ......................4

*Pincover v. J.P. Morgan Chase Bank, N.A.*,
21-cv-3524 (PAE), 2022 WL 864246 (S.D.N.Y. Mar. 22, 2022) ......................9, 11

*Press v. Chem. Inv. Servs. Corp.*,
166 F.3d 529 (2d Cir. 1999) ...................................................................................18

*Rayner v. E\*TRADE Fin. Corp.*,
248 F. Supp. 3d 497 (S.D.N.Y. 2017), *aff'd*, 899 F.3d 117 (2d Cir. 2018) ............................21

*Rayner v. E\*TRADE Fin. Corp.*,
899 F.3d 117 (2d Cir. 2018) .............................................................................19, 20

*In re Refco Secs. Litig.*,
759 F. Supp. 2d 301 (S.D.N.Y. 2010) ....................................................................18

*Schwab v. E\*TRADE Fin. Corp.*,
258 F. Supp. 3d 418 (S.D.N.Y. 2017) ..............................................................17, 18

*Stifel, Nicolaus & Co., Inc. v. Shift Techs., Inc.*,
21-cv-4135 (NRB), 2022 WL 3648145 ...................................................11

*In re Stillwater Capital Partners Inc. Litig.*,
851 F. Supp. 2d 556 (S.D.N.Y. 2012)......................................................22

*Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*,
43 F. Supp. 3d 236 (S.D.N.Y. 2014).........................................................25

**Statutes & Rules**

Fed. R. Civ. P. 12(b)(6)..........................................................................1, 8, 9, 14

Fed. R. Evid. 201(b)(2) ..................................................................................4

FINRA Rule 5310 .........................................................................................17

NYSE Rule 7.35.............................................................................................16

Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b)(2)..............19

Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)...... passim

**Other Authorities**

NYSE, *Quarterly Expiration Day – March 18, 2022* ..............................4, 16

NYSE, *Why you should care about the NYSE Closing Auction*,
https://www.nyse.com/network/article/nyse-closing-auction...............4, 5

Defendant Citigroup Global Markets Inc. ("CGMI") respectfully submits this Motion to Dismiss Plaintiff Loomis Sayles Trust Company, LLC's ("LSTC") Complaint in its entirety, and with prejudice, for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and because the claims asserted are precluded by the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1)(A) ("SLUSA"). In the alternative, CGMI respectfully submits that LSTC's fiduciary claim should be dismissed as duplicative of its contract claim.

## PRELIMINARY STATEMENT

This case concerns stock trades that investment advisor Loomis, Sayles & Company, L.P. ("Loomis")—the sole member of LSTC—instructed CGMI to place on March 18, 2022, on behalf of Loomis's clients and LSTC. (Compl. ¶¶ 1, 12; *see also* Dkt. 26 at 1–2, Appx. A.) Among those instructions were orders to sell 5,236,139 shares of Colgate-Palmolive Company ("CL") and purchase 780,856 shares of Shopify, Inc. ("SHOP"). (Compl. ¶ 1.) Pursuant to Loomis's instructions, CGMI placed those orders for execution on the New York Stock Exchange ("NYSE") closing auction at the end of the trading day on March 18, 2022. Ultimately, the market prices received for CL and SHOP in the closing auction were respectively lower (for CL) and higher (for SHOP) than Loomis allegedly expected. LSTC seeks to hold CGMI responsible for those alleged investment losses on the theory that CGMI failed to achieve "best execution" on the trades. Those arguments are without merit.

As the Complaint and the contemporaneous communications incorporated by reference make plain, Loomis—not CGMI—decided what stocks to trade, the number of shares to trade, and the manner in which the trades should be placed with the NYSE. Contrary to Plaintiff's assertions, CGMI had no discretion to modify or cancel the various trades. Rather, CGMI's duty, acting as broker and agent, was to place the orders in accordance with the instructions

conveyed by Loomis's own Director and Head of Trading for Growth Equity Strategies, Nicholas Gagnon. That is precisely what CGMI did.

Dissatisfied with the ultimate outcome of its own trading decisions for two of the 42 stocks it instructed CGMI to trade that day, Loomis now attempts to shift the blame, wrongly suggesting that CGMI was obligated to exercise its own unilateral discretion to place the trades, or even to not place the trades at all, for execution with the NYSE in a manner that *differed* from the understanding reached between Loomis and CGMI. Plaintiff's theory appears to be that CGMI should have recognized that Loomis's strategy to place the trades at the NYSE close would backfire and CGMI had a duty to disregard Loomis's instructions to protect Loomis's clients from their own sophisticated and experienced investment manager. LSTC's claims for (i) breach of contract for allegedly "fail[ing] to execute [the orders for CL and SHOP] in accordance with the accompanying instructions and [CGMI's] duty of best execution" (Compl. ¶ 74 (Count 1)) and (ii) breach of fiduciary duty for allegedly "failing to reasonably evaluate liquidity" before executing the orders (*id.* at ¶ 78 (Count 2)), should be dismissed, with prejudice, for the following reasons.

*First*, the entire basis for Plaintiff's claims is that CGMI failed to comply with Loomis's instructions for the CL and SHOP orders. Loomis provided those instructions to CGMI throughout the day via Bloomberg chats and recorded phone calls, but the Complaint quotes only selectively and misleadingly from those communications. Because the communications are integral to and incorporated by reference into the Complaint, the Court may properly consider them in their entirety in deciding this Motion. (*See infra* § I.)

*Second*, the Complaint fails plausibly to allege that CGMI breached any contractual or fiduciary duty to LSTC or any absent class member. To the contrary, the record before the Court

on this Motion makes plain that *Loomis*, not CGMI, exercised the discretion regarding the orders for CL and SHOP, and that CGMI complied with its narrow duty to execute those orders as instructed by Loomis. Contrary to the Complaint's misleading excerpts, the full communications on March 18, 2022, make clear that CGMI did not have the sort of discretion that LSTC claims, but rather that Loomis instructed CGMI to place "market-on-close", or "MOC", orders for CL and SHOP, which was confirmed by CGMI back to Loomis in the final minutes leading up to the NYSE closing auction. Moreover, LSTC's contention that CGMI had some obligation to change or recall the CL and SHOP orders after they were placed into the closing auction is entirely baseless and would have required CGMI to act unilaterally and *contrary to* Loomis's instructions. Accordingly, LSTC's contract and fiduciary duty claims for CGMI's alleged failure to comply with its "best execution" obligations should be dismissed with prejudice. (*See infra* § II.)

*Third*, the Complaint should be dismissed pursuant to SLUSA, which prevents class action plaintiffs from artfully pleading securities fraud claims as state law causes of action. The crux of the Complaint is that LSTC paid too much and received too little for the trades at issue because CGMI misrepresented the actions and analysis it would take prior to executing on the trades. LSTC's claims thus fall squarely within the ambit of SLUSA. LSTC's efforts to characterize its claims otherwise are based on the demonstrably false assertion—again, in reliance on the incomplete and misleading depiction of the parties' communications—that the alleged misrepresentations at issue did not occur until after the trading instructions had been finalized. (*See infra* § III.)

*Fourth*, LSTC's breach of fiduciary duty claim (Count 2) should be dismissed for the additional reason that it is entirely duplicative of the breach of contract claim (Count 1). Both

counts are based on the same alleged facts, circumstances and legal duty, and seek the same damages, which is a common basis to dismiss a breach of fiduciary claim. (*See infra* § IV.)

## FACTUAL BACKGROUND

### A.      The NYSE Closing Auction and Quadruple "Witching" Day.

The NYSE "closing auction" takes place at the end of each trading day and is a "single-price auction that matches buy and sell orders at the price that maximizes the amount of tradeable stock." (Compl. ¶ 27 (internal quotation marks and citation omitted).) Each NYSE-traded stock has a Designated Market Maker ("DMM", historically referred to as a market specialist), who is responsible for facilitating the closing auction and determining the closing price. (Ex. 4 (NYSE Memo) at 1, 4.)[1] Among other options, an order placed for the closing auction can be entered as "market-on-close" ("MOC"), which means the trade is executed regardless of the closing price, or "limit-on-close" ("LOC"), which means the trade is executed only if the closing price is at or better than the investor's designated limit. (*Id.* ¶ 32.[2]) In other words, with an LOC order, if the stock is not trading at or better than the limit price, that

---

[1] Exhibits cited herein are attached to the Declaration of Helam Gebremariam in Support of CGMI's Motion to Dismiss, dated November 16, 2022.

The Complaint includes a hyperlink to an NYSE Regulatory Memo dated March 14, 2022, titled "Quarterly Expiration Day – March 18, 2022" ("NYSE Memo"), and explicitly references and discusses the rules and policies discussed therein. (Compl. ¶¶ 59 ("Pursuant to the then-existing NYSE rules and policies . . ."), 60 ("[T]he then-existing NYSE rules expressly allowed . . .").) Accordingly, the Complaint incorporates the NYSE Memo by reference. *See Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d. 327, 330–31 (S.D.N.Y. 2003) ("To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents."). And even if the NYSE Memo were not incorporated by reference, this Court may properly take judicial notice of it. As set forth in CGMI's Request for Judicial Notice in Support of its Motion to Dismiss filed herewith, the NYSE Memo "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned", and therefore may properly be considered. Fed. R. Evid. 201(b)(2); *see also Olagues v. Perceptive Advisers LLC*, No. 15-cv-1190 (AJN), 2016 WL 4742310, at *2 (S.D.N.Y. Sept. 9, 2016) ("The Court may also take judicial notice of the public rules of . . . [FINRA] under Federal Rule of Evidence 201.").

[2] *See also* NYSE, *Why you should care about the NYSE Closing Auction*, https://www.nyse.com/network/article/nyse-closing-auction (last visited Nov. 14, 2022) (cited at Compl. ¶ 27) ("NYSE Article").

particular investor does not participate in the closing auction and its trade is not executed. The cutoff time for placing orders in the NYSE closing auction—whether MOC or LOC—is 3:50 p.m., ten minutes before the 4:00 p.m. close of trading. (Compl. ¶ 50.)

March 18, 2022, the date of the trades at issue in this litigation, was a so-called quadruple "witching" day, which is the date each quarter that stock options, index options and index futures expire and certain large indices, such as Standard and Poor's U.S. indices, "rebalance". (Compl. ¶ 27.) This rebalancing activity tends to increase liquidity in the market significantly as compared to a regular trading day (*id.*), and such liquidity is further "centralized" during the closing auction. (*See* NYSE Article, *supra* n.2 (cited at Compl. ¶ 27).)

**B.** **The March 18, 2022 Communications That Comprise Loomis's Trading Instructions to CGMI.**

On March 18, 2022, Loomis gave trading instructions to CGMI, as broker and agent, for two "waves" of stock trades it requested that CGMI place as broker. (*Id.* ¶ 29.) Loomis, through its Director and Head of Trading for Growth Equity Strategies, Nicholas Gagnon, provided CGMI trader Joseph Chiomastro instructions regarding the first wave of orders at 2:18 p.m., which included orders for 33 stocks totaling 1,250,393 shares. (Ex. 1 at 2:18:03 p.m.) Mr. Gagnon instructed Mr. Chiomastro to "start early as needed" and "target MOC". (Compl. ¶ 32.) Loomis informed Mr. Chiomastro of a second wave of orders at 2:30 p.m., and increased the volume of the orders in that wave shortly after 3:30 p.m. (Ex. 1 at 2:30:11 p.m., 3:26:38– 3:42:27 p.m.) The second wave contemplated orders for nine stocks (ADP, CL, DOCS, PYPL, SHOP, SAM, SLB, SQ, and VEEV) totaling 16,738,542 shares (prior to the subsequent quantity increases), including those to sell 5,236,139 shares of CL and to buy 780,856 shares of SHOP at

issue in this case. (Compl. ¶ 34.) Loomis has never complained about CGMI's trade execution for any of the 40 other stocks in either wave.

For the second wave of orders, the Complaint refers to excerpts of some Bloomberg chat messages between Loomis and Mr. Chiomastro that it alleges are the instructions that Loomis provided and CGMI agreed to execute. (*Id.* ¶¶ 35–38.) In the excerpts quoted in the Complaint, Mr. Gagnon stated that Mr. Chiomastro should "wave out what [CGMI] think[s] is good for an aggressive MOC piece" and "trade the rest best way", "be most aggressive near the close" and that "the orders '[d]o not have to be complete on any of the second wave'". (*Id.* ¶ 36.)

What the Complaint omits, however, is that those quoted excerpts occurred at 2:30–2:31 p.m. and comprise only a small portion at the start of a running dialogue between Mr. Gagnon (and others at Loomis) and Mr. Chiomastro that continued right up to the time that CGMI placed the orders for CL and SHOP just before the 3:50 p.m. NYSE cutoff time. (*See* Exs. 1–3 (collectively, the "March 18 Communications").) Over the approximately 80 minutes that followed the 2:30–2:31 p.m. chats quoted and described in the Complaint, Mr. Gagnon and Mr. Chiomastro discussed potential trading strategies for the second wave of orders, and the record makes clear that Loomis and CGMI ultimately agreed that Mr. Chiomastro should place an LOC, as opposed to MOC, order for only one stock in the second wave. That stock was SAM (*i.e.*, The Boston Beer Company), not SHOP or CL. A chronology of the parties' communications during that critical window is detailed below, and the March 18 Communications have been provided to the Court in their entirety as Exhibits 1–3.

More specifically, the Complaint omits that, during the 2:30–2:31 p.m. exchange it quotes, Mr. Gagnon told Mr. Chiomastro to "[g]ive me a call to confirm once ready" so he could "talk [Mr. Chiomastro] through now". (Ex. 1 at 2:30:11–2:31:16 p.m.) Immediately at

2:32 p.m., the conversation shifted to a recorded telephone line, and Mr. Chiomastro said, "[h]opefully we can do all of it on the close", that CGMI would do some "analysis, kind of vs. what the Street is showing . . . . And I'm also happy to kind of look at some on LOCs for a little bit more protection." (Ex. 2 at 1:20–23.) Mr. Gagnon responded that he "agree[d] with what [Mr. Chiomastro] said", that "CL and SAM were the only two that [Loomis] thought were potential issues" with respect to liquidity, that "SAM is the one that probably makes sense to use the most protection" (*i.e.*, an LOC order), and that "I think it's going to be just SAM and CL but mostly just likely SAM that you have trouble with". (*Id.* at 2:1–9.) Mr. Chiomastro responded that he would "keep an eye on SAM and CL in particular". (*Id.* at 2:20–21.)

After the phone call, the conversation switched back to Bloomberg chat, and between 2:49 p.m. and 3:29 p.m., Mr. Chiomastro communicated with Mr. Gagnon and Daniel Maturi of Loomis regarding market color and liquidity analyses of the various stocks. Among those chats, at 3:11 p.m. Mr. Chiomastro reported liquidity data for the second wave of stocks, which showed the quantities Loomis wanted to trade were 1190% of the "Street" for SHOP, -1040% for CL, and -32,685% for SAM. (Ex. 1 at 3:11:10 p.m.)

At 3:31 p.m., they were back on the telephone. Mr. Chiomastro asked Mr. Gagnon to "get a sense of LOC level", and Mr. Gagnon asked Mr. Chiomastro "how many are you thinking you'll use [LOC]". (Ex. 3 at 1:3–4, 1:6–7.) In response, Mr. Chiomastro stated that "I'm hoping, that our, our plan remains intact for probably just with some SAM and maybe some CL. Um, SHOP is slowly pairing off so I'm just not pushing that one too much yet." (*Id.* at 1:9–11.) Mr. Gagnon and Mr. Chiomastro went on to discuss potential LOC orders only for CL and SAM, and Mr. Gagnon stated that from Loomis's own analysis he "s[aw] some buyers showing up in CL" and that it would be "fine" to place the CL orders as MOC. (*Id.* at 2:10–15.) Mr.

Chiomastro then confirmed, "I do think that CL we just end up being down there all MOC, we don't probably even need an LOC, but with SAM I'm just, you know, back to our original conversation, that one I'm not going to push [MOC]." (*Id.* at 2:21–23.) Mr. Gagnon replied, "That sounds perfect." (*Id.* at 3:5.)

The conversation then switched back to Bloomberg chat. At 3:44 p.m., Mr. Chiomastro reported additional market color to Mr. Gagnon: "SHOP-- 440k to buy...p/o 40k." (Ex. 1 at 3:44:03 p.m.) Mr. Chiomastro then updated Mr. Gagnon that all of Loomis's SHOP order had been placed MOC except for approximately 346,000 shares. (*Id.* at 3:44:14–18 ("346k SHOP in hand[.] The rest is MOC").) At 3:48 p.m., two minutes before the cutoff time to place orders in the closing auction, Mr. Gagnon responded, "Thanks" and asked Mr. Chiomastro to confirm that he was "looking to complete all except maybe SAM", to which Mr. Chiomastro responded "yes". (*Id.* at 3:48:50–3:49:29.) Neither Mr. Gagnon nor anyone else at Loomis instructed Mr. Chiomastro to change the CL or SHOP orders from MOC to LOC or reduce the number of shares, or suggested that the full requested quantities should not be traded. The only stock with a limiting instruction from Loomis was SAM.

Finally, at 3:50 p.m., Mr. Chiomastro confirmed he had placed the orders for CL, SHOP, and the other stocks in the second wave with the exception of SAM, as MOC orders in the closing auction. (*Id.* at 3:50:26 p.m. ("I have all down now MOC x SAM"); *see* Compl. ¶ 53.)

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the Court must accept well-pled allegations as true, but "it does not credit 'mere conclusory statements'." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 585 (S.D.N.Y. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the

Complaint." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151–52 (2d Cir. 2014) (citations and internal quotation marks omitted). A "complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When determining what is plausible, a court should consider the context and "draw on its judicial experience and common sense". *Ashcroft*, 556 U.S. at 679.

A complaint is properly deemed to include any statements or documents that it incorporates by reference or relies upon so heavily as to render them "integral". *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002). These principles "prevent[] plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting". *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

## ARGUMENT

### I. THE MARCH 18 COMMUNICATIONS THAT COMPRISE LOOMIS'S INSTRUCTIONS TO CGMI ARE PART OF THE PLEADINGS AND THE COURT MAY CONSIDER THEM FOR PURPOSES OF THIS MOTION.

As an initial matter, the Court may properly consider the March 18 Communications (Exs. 1–3) in deciding this Motion because they are integral to and incorporated by reference into the Complaint. The entire basis for LSTC's claims is that CGMI "failed to comply with LSTC and Loomis' instructions" for the CL and SHOP trades (Compl. ¶ 1)—"instructions" that were provided to CGMI solely via the March 18 Communications. (*Id.* ¶¶ 31–39.)

Courts in this Circuit routinely consider documents setting forth the complete terms of an agreement to be integral to a complaint that alleges breach of the agreement. *See, e.g.*, *Pincover v. J.P. Morgan Chase Bank, N.A.*, 21-cv-3524 (PAE), 2022 WL 864246, at *5 (S.D.N.Y. Mar. 22, 2022) (finding agreement integral to complaint alleging breach of the agreement). While Plaintiff's pre-motion letter urged this Court to accept "the plain text *of the Complaint . . .* as

true" (Dkt. 22 at 2 (emphasis added)), the Second Circuit squarely rejected such an approach in *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2005): "Insofar as the complaint relies on the terms of Cablevision's customer agreement, therefore, we need not accept its description of those terms, but may look to the agreement itself."

Here, the relevant "agreement" is reflected in the totality of the March 18 Communications, not merely the portions that the Complaint selectively and misleadingly sets forth. Indeed, LSTC's omissions are particularly egregious, because the Complaint presents the quoted portions as the entirety of Loomis's "instructions" to CGMI, when in fact the quoted snippets: (i) are from a portion of the communications that occurred at 2:30–2:31 p.m., approximately 80 minutes before the orders for CL and SHOP were placed, and (ii) were supplemented, clarified and superseded by extensive and continuous discussion over those ensuing 80 minutes, up until mere seconds before the 3:50 p.m. deadline for the closing auction. And as discussed below in more detail (*see infra* § II.A), the Complaint's selective recitation creates the false impression that Loomis instructed CGMI to enter either MOC or LOC orders (or enter other types of orders, or refrain from placing orders) for CL and SHOP at CGMI's discretion, when in fact Loomis instructed CGMI to enter MOC orders for the full quantities requested and CGMI confirmed that instruction back to Loomis just before execution. That is precisely the type of "clever drafting" that courts disfavor, *see Global Network*, 458 F.3d at 157, and LSTC's incomplete and misleading portrayal of Loomis's instructions should not be accepted as true for purposes of CGMI's Motion.

Moreover, the full March 18 Communications are integral to the Complaint because the Complaint relies "heavily" upon their "terms and effects", and LSTC had "actual notice of all the information in the [communications] and relied upon [them] in framing" the Complaint.

*Pincover*, 2022 WL 864246, at *4; *see also Broder*, 418 F.3d at 196.  The Complaint explicitly references portions of those instructions and CGMI's alleged failure to comply with them (*see* Compl. ¶¶ 1, 31–32, 35–36, 40–41, 64, 71, 74), which forms the basis for both causes of action LSTC asserts (*see id.* ¶¶ 74 (contract claim alleging CGMI "failed to execute in accordance with the accompanying instructions"), 77 (fiduciary duty claim alleging CGMI was required to act "within the parameters delivered")).  And by quoting (albeit selectively and misleadingly) portions of the March 18 Communications (*see* Compl. ¶¶ 31–32, 35–37, 57), the Complaint "make[s] clear, definite and substantial reference[s] to" them.  *Helprin*, 277 F. Supp 2d. at 331 (S.D.N.Y. 2003).  Such references easily qualify to incorporate the March 18 Communications by reference.  *See Stifel, Nicolaus & Co., Inc. v. Shift Techs., Inc.*, 21-cv-4135 (NRB), 2022 WL 3648145, at *1 n.2 (presentation incorporated by reference when complaint "discuss[ed] the fact of the presentation and its contents").

## II.     THE COMPLAINT FAILS PLAUSIBLY TO ALLEGE THAT CGMI BREACHED EITHER A CONTRACTUAL OR FIDUCIARY DUTY OF "BEST EXECUTION".

### A.     The allegations in the Complaint are contradicted by Loomis's express instructions regarding the orders for CL and SHOP and the rules governing the NYSE closing auction.

LSTC's claims are based on the core allegation that CGMI failed to comply with its duty of "best execution".  (Compl. ¶¶ 74, 77–78.)  Specifically, LSTC contends (i) CGMI should not have placed the orders for CL and SHOP as MOC orders "when any reasonable analysis of liquidity and imbalance data would have revealed that the auction could not bear the full quantity of the orders without materially affecting the stock price"; (ii) CGMI should have canceled some portion of the CL and SHOP MOC orders prior to the cutoff time; and (iii) CGMI should have availed itself of other measures allegedly at its disposal, such as contacting NYSE or the DMM "to suspend the auction for dislocation, call for more liquidity, and/or cancel orders in the

auction". (Compl. ¶¶ 56–60.) Those theories, however, are contradicted by the actual trading instructions that Loomis gave CGMI in the March 18 Communications and are contrary to the applicable NYSE Rules. Accordingly, the Complaint should be dismissed with prejudice.

*First*, LSTC alleges that CGMI failed to exercise its discretion and utilize LOC, rather than MOC, orders, or otherwise not complete the orders on March 18. (Compl. ¶¶ 37, 57.) However, the March 18 Communications make clear that Loomis *instructed* CGMI to place the orders for CL and SHOP *as MOC orders for completion on March 18*. CGMI, accordingly, lacked the trading "discretion" that the Complaint claims CGMI had (Compl. ¶ 40), and which LSTC has described to the Court as "the hallmark of best execution" (Dkt. 22 at 1).

To support its contention that CGMI had discretion to, and should have, placed the orders for CL and SHOP as LOC orders—or some other type of order, or no order at all (*see* Compl. ¶¶ 37, 57)—LSTC points to what were merely Loomis's initial communications to CGMI regarding the second wave of trades. (*Id.* ¶ 36 (chats to Mr. Chiomastro to "'wave out what you think is good for an aggressive MOC piece' and 'trade the rest the best way'", and stating that the orders "[d]o not have to be complete on any of the second wave").) But the quotations in paragraph 36 of the Complaint are incomplete and misleading. Indeed, that is obvious even from the face of those initial chats at 2:30–2:31 p.m., as the Complaint omits that Mr. Gagnon also asked Mr. Chiomastro to speak by telephone, so he could "talk [Mr. Chiomastro] through" Loomis's strategy for the second wave of trades. (Ex. 1 at 2:29:59–2:31:16 p.m.)

Critically, Mr. Gagnon's statements on the immediately ensuing call contradict the Complaint's description of the instructions. Mr. Gagnon stated that "CL and SAM were the *only two* that [Loomis] thought were potential issues" concerning liquidity, concluding, "*I think it's going to be just SAM and CL but mostly just likely SAM that you have trouble with*". (Ex. 2 at

2:1–9 (emphasis added).)  Over the next 80 minutes, Loomis and CGMI were in constant

communication regarding how Loomis wanted CGMI to execute the second wave of trades,

making clear that the instructions as described in the Complaint were far from finalized.

Indeed, when Mr. Gagnon and Mr. Chiomastro spoke by phone again at 3:31 p.m.,

Mr. Gagnon concluded it would be "fine" to place the CL orders as MOC, and Mr. Chiomastro

confirmed, "I do think that CL we just end up being down there all MOC, we don't probably

even need an LOC and then SAM I'm just, you know, back to our original conversation, that one

I'm not going to push [MOC]."  (Ex. 3 at 2:15–23.)  Mr. Gagnon replied, "*That sounds perfect.*"

(*Id.* at 3:5 (emphasis added).)

Just before the closing auction deadline, Mr. Chiomastro and Mr. Gagnon were still

discussing market liquidity data and the trading strategy for SHOP.  At 3:44 p.m.,

Mr. Chiomastro reported trading imbalance data via Bloomberg chat: "SHOP-- 440k to buy...p/o

40k".  (Ex. 1 at 3:44:03 p.m.)  Mr. Chiomastro then updated Mr. Gagnon that all of Loomis's

SHOP order had been placed MOC except for approximately 346,000 shares (out of

approximately 780,000 total).  (*Id.* at 3:44:14–18 ("346k SHOP in hand[.]  The rest is MOC").)

At 3:48 p.m., Mr. Gagnon responded "Thanks", acknowledging the orders that had already been

placed MOC.  (*Id.* at 3:48:50.)  Mr. Gagnon confirmed that Mr. Chiomastro was "looking to

complete all except maybe SAM", to which Mr. Chiomastro responded "yes".  (*Id.* at 3:48:50–

3:49:29.)  That exchange, approximately one minute before the cutoff time, clarifies that Loomis

knew CGMI had already placed the majority of the SHOP order MOC and that Loomis

instructed CGMI to place MOC the rest of the orders, including SHOP, with the exception only

of SAM.  Placing LOC orders—or reducing the number of shares in the orders—would have

contradicted Mr. Gagnon's directive to "complete all" of the trades.  Consistent with the parties'

agreement, at 3:50 p.m., Mr. Chiomastro confirmed that he had placed the orders as Loomis had instructed: "*I have all down now MOC x SAM*". (*Id.* at 3:50:26 p.m.)

Contrary to the Complaint's incomplete quotations and misleading characterization, the full March 18 Communications make clear that, while Loomis and CGMI discussed LOC orders early on as a potential trading strategy for the second wave of stocks, Loomis ultimately decided and agreed that CGMI should *not use LOC orders for SHOP or CL*, and should use them only for SAM. As the Second Circuit opined in *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991): "Were courts to refrain from considering [documents incorporated by reference], complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure."

Moreover, to the extent LSTC contends that CGMI or Loomis would have altered the orders or given different instructions had CGMI conducted a "reasonable analysis of liquidity and imbalance data" (Compl. ¶ 56), that also must fail. The March 18 Communications show CGMI *did* conduct such analyses and *relayed the information to Loomis*. As described above, Mr. Chiomastro sent liquidity data to Loomis that indicated that its SHOP order was 1190% of the "Street", its CL order was -1040%, and its SAM order was -32,685%. (Ex. 1 at 3:11:10 p.m.) Throughout the day, Mr. Chiomastro also monitored the imbalance data for the stocks in Loomis's second wave and periodically reported it to Loomis. (*See id.* at 2:49:59 p.m. ("Ill be monitoring imbalances in the others but expect to get most done as discussed...SAM/CL close eye."), 2:55:43 p.m. (reporting on "CL SAM SHOP SLB imbals...this includes 50% of our ticket down on[] [t]he close"), 3:44:03 p.m. ("SHOP-- 440k to buy...p/o [pair off] 40k").) In addition, the March 18 Communications evidence that Loomis received and digested CGMI's analyses and *subsequently decided to proceed with MOC orders for the full CL and SHOP orders* (and the

rest of the stocks except for SAM).  As such, LSTC cannot plausibly allege that the liquidity and imbalance data made clear that the market could not handle its CL and SHOP orders because *Loomis itself* considered that data and its Head of Trading for Growth Equity Strategies confirmed the instruction to CGMI to place the full quantity of the SHOP and CL orders as MOC orders.  (*See* Ex. 1 at 3:48:50–3:49:29 p.m. (Gagnon: "looking to *complete all* except maybe SAM?"  Chiomastro: "yes").)[3]

*Second*, LSTC asserts CGMI should have canceled the orders between the 3:50 p.m. NYSE cutoff time and 3:58 p.m., as NYSE rules at the time allowed in the event of a "legitimate error".  (Compl. ¶ 59.)  But the Complaint does not plausibly allege any "legitimate error" of which CGMI could have been aware during that time window.  Rather, as the March 18 Communications show, at 3:48–3:49 p.m., Mr. Chiomastro confirmed that, per Loomis's instructions, he was placing all orders MOC except SAM and then confirmed once he had done that.  (Ex. 1 at 3:48:50–3:49:29 p.m., 3:50:26 p.m.)  There was no error to be corrected, and canceling the orders after 3:50 p.m. would have required CGMI to go *against* Loomis's instructions to place the CL and SHOP orders MOC.  Nor did Mr. Gagnon respond to Mr. Chiomastro's chat by stating that entering MOC orders had been a mistake (because it was not), even though Mr. Gagnon did continue to chat with Mr. Chiomastro regarding SAM in the 3:50–3:58 p.m. window.  (*See id.*)

Moreover, what LSTC describes is not remotely the sort of "legitimate error" contemplated by the NYSE Rules.  Rather, "legitimate error" is defined by NYSE Rule

---

[3] LSTC's contention in its pre-motion letter that the liquidity and imbalance data was only provided by CGMI *after* the trading instructions were given by Loomis and accepted by CGMI (*see* Dkt. No. 22 at 3 & n.1), is based on the same incomplete and misleading allegations described above and is plainly wrong.  As the March 18 Communications make clear, there was a running dialogue between CGMI and Loomis regarding what trades to execute right up until the orders were placed at the 3:50 p.m. cutoff time, and throughout that time frame is when CGMI provided the liquidity and imbalance analyses to Loomis.

7.35(a)(13) as "an error in any term of an order, such as price, number of shares, side of the transaction (buy or sell), or identification of the security". (Ex. 4 (NYSE Memo) at 2 n.3.) What the Complaint describes—alleged errors in judgment and strategy "in analyzing the appropriate number of shares to enter into the closing auction" (Compl. ¶ 59)—is none of those things.

*Third*, LSTC contends that CGMI should have availed itself of other measures, such as contacting the NYSE or involving the nonparty DMM to suspend the closing auction. (Compl. ¶ 60.) But the Complaint does not allege any facts that explain how CGMI should have—or could have—taken such extraordinary steps. NYSE Rule 7.35(j) allows for certain "temporary suspension[s]" of closing auctions, including in the event that there is an "extreme order imbalance[] at or near the close", but it provides that *only the DMM* may request a temporary suspension. (Ex. 4 (NYSE Memo) at 4.) The Complaint makes no allegation about why the obligation was on CGMI to contact NYSE or the DMM regarding a temporary rule suspension. Indeed, it would make no sense for a broker like CGMI to have an obligation to report an "extreme order imbalance" in the closing auction to the DMM or NYSE, because they are not privy to all of the order flow that the DMM sees in connection with the closing auction. LSTC does not allege otherwise. Nor does LSTC allege that CGMI even knew at the time who the DMMs for CL and SHOP were, or that such information is public.

In addition, to the extent that CGMI had access to liquidity and imbalance data, that preceded the 3:50 p.m. trading cutoff for the closing auction. (*See, e.g.*, Ex. 1 at 2:49:59 p.m. ("Ill be monitoring imbalances in the others but expect to get most done as discussed...SAM/CL close eye."), 3:44:03 p.m. ("SHOP-- 440k to buy . . . p/o [pair off] 40k").) Moreover, the March 18 Communications show CGMI shared that liquidity and imbalance data with Loomis, and, as discussed above, Loomis still decided to proceed with its aggressive instructions to place MOC

orders for CL and SHOP. LSTC alleges no facts to suggest CGMI was in possession of other information not shared with Loomis that purportedly gave it any sort of inside knowledge regarding any "extreme order imbalances [for SHOP or CL] at or near the close". (Ex. 4 at 4.)

**B.** **CGMI owed no "best execution" duty to Loomis beyond its limited obligation to execute the orders in accordance with Loomis's instructions, which it followed.**

While the Complaint makes numerous references to CGMI's alleged "duty of best execution", that duty did not require or provide CGMI any authority to deviate from Loomis's instructions. "The duty of best execution [] requires that a broker-dealer seek to obtain for its customer orders the most favorable terms reasonably available under the circumstances." *Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F. 3d 266, 270 (3d Cir. 1998). FINRA Rule 5310, to which courts have looked to define the duty of best execution, provides that members shall "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions." *Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 425 (S.D.N.Y. 2017). As such, best execution cases typically involve allegations that a broker failed to select the most favorable venue for a customer's trades. *See, e.g.*, *Gurfein v. Ameritrade*, 312 F. App'x 410, 412 (2d Cir. 2009) (dismissing best execution allegations because complaint did not sufficiently allege "an alternative exchange that was reasonably available to [defendant] under the circumstances and that would have offered materially better overall execution").

This is not such a case, and LSTC's attempts to fit this case into the best execution mold fail. (*See* Compl. ¶¶ 1, 9, 47-49, 56, 64, 66, 68, 74, 78.) The Complaint primarily alleges that CGMI erred by placing the MOC orders for CL and SHOP, while failing to recognize order imbalances that would push the price of CL down and the price of SHOP up in the NYSE closing

auctions.  (*See, e.g.*, *id.* ¶¶ 53, 56.)  That is not a failure "to ascertain the best market", *Schwab*, 258 F. Supp. 3d at 425, for the relevant orders—there was no conceivable market other than the NYSE in which to execute, and LSTC does not contend otherwise.  Indeed, Loomis's entire trading strategy was premised on taking advantage of increased liquidity *in the NYSE closing auctions* on March 18 in connection with "quadruple witching" day.  (*See* Compl. ¶¶ 27-29.)

Moreover, while the Complaint misleadingly references excerpts of the March 18 Communications that preceded CMGI's placing of the orders in the closing auction by well over an hour, the entirety of those communications make clear that *Loomis* selected the securities and volumes it wished to trade, and that *Loomis* made the decisions about when, where and how the trades should be executed.  (*See* Compl. ¶¶ 28–29, 34–38; *see also*, *e.g.*, Ex. 1 at 2:30:11 p.m., 3:42:15 p.m.; Ex. 2 at 2:1-9; Ex. 3 at 2:1–5.)  Contrary to Plaintiff's contention (*see* Compl. ¶ 35), CGMI did not have "discretionary trading authority", and "where a broker does not have discretionary trading authority over an account, the broker's only duty is the proper execution of transactions upon explicit customer instructions."  *In re Refco Secs. Litig.*, 759 F. Supp. 2d 301, 323 (S.D.N.Y. 2010); *see also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) ("The cases that have recognized the fiduciary relationship as evolving simply from the broker-client relationship have limited the scope of the fiduciary duty to the narrow task of consummating the transaction requested.").  Consistent with those standards, LSTC has already acknowledged to this Court that a lack of discretion means "the hallmark of best execution" is lacking as well.  (Dkt. 22 at 1.)

The March 18 Communications show that CGMI complied with LSTC's instructions by entering MOC orders for the entirety of the CL and SHOP orders, and the Complaint fails to point to any action that CGMI took without authorization.  (*See generally* Compl. ¶¶ 23–69; Exs.

1–3.)  Rather, CGMI kept Loomis apprised moment-by-moment in the leadup to the closing auction, and performed exactly as instructed.  Accordingly, the Complaint fails plausibly to allege that CGMI breached any limited contractual or fiduciary duties it owed with respect to the relevant orders.

## III.    THE COMPLAINT SHOULD BE DISMISSED FOR THE INDEPENDENT REASON THAT LSTC'S CLAIMS ARE PRECLUDED BY SLUSA.

LSTC's state law breach of contract and fiduciary duty claims should be dismissed for the independent reason that they are precluded by SLUSA.  15 U.S.C. § 78bb(f)(1)(A).  SLUSA prevents plaintiffs from avoiding the heightened pleading requirements and mandatory discovery stay applicable to securities fraud class actions under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b)(2) ("PSLRA"), by styling claims as ones alleging breaches of state common law.  *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 429 (S.D.N.Y. 2010).  More specifically, SLUSA precludes "(1) [] covered class action[s] (2) based on state law claims, (3) alleging that defendants made 'a misrepresentation or omission of a material fact' or 'used or employed any manipulative or deceptive device or contrivance' (4) 'in connection with' the purchase or sale of (5) covered securities."  *Rayner v. E*TRADE Fin. Corp.*, 899 F.3d 117, 120 (2d Cir. 2018) (citing 15 U.S.C. § 78bb(f)(1)).

Each of those requirements is satisfied here.  With respect to elements (1), (2), (4) and (5), there is no question that this is a covered class action based on state law claims and the alleged misconduct was "in connection with" the purchase and sale of "covered securities".  LSTC seeks damages on behalf of a putative class that allegedly includes more than 200 members, for claims alleging state common law breaches of contract and fiduciary duties. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 83 (2006); 15 U.S.C. § 78bb(f)(5)(B)(i)(I); Compl. ¶¶ 64-69 (alleging this action satisfies requirements of Rule 23(a)–

(b)), ¶¶ 70–79 (setting forth state law causes of action).  CL and SHOP are listed on NYSE and are therefore "covered securities".  *See Fisher v. Kanas*, 288 F. App'x 721, 723 (2d Cir. 2008) (citing *Dabit*, 574 U.S. at 85) ("in connection with" requirement is interpreted broadly); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 430 (S.D.N.Y. 2010) ("covered security" under SLUSA includes those listed on NYSE).

Finally, while based on its artful pleading LSTC denies that it alleges CGMI made "a misrepresentation or omission of a material fact" or "used or employed any manipulative or deceptive device or contrivance" (Dkt. No. 22 at 2–3), element (3) is also clearly satisfied.  In "assessing whether [a party's] allegations fall within the ambit of SLUSA", courts "emphasize substance over form".  *Rayner*, 899 F.3d at 120.  Here, LSTC "cannot avoid SLUSA merely by consciously omitting references to securities or to the federal securities law" and instead styling its claims as common law breaches of contract and fiduciary duty.  *Id.*  The substance of the claims sounds in fraud because LSTC alleges CGMI made material misrepresentations and omissions regarding the orders for CL and SHOP.

*First*, as a general matter, LSTC claims that CGMI misrepresented that it would execute the second wave of trades on the terms Loomis provided, and therefore in accordance with its alleged duty of best execution.  (Compl. ¶ 1 ("Citigroup accepted the Affected Orders and agreed to execute as directed.  Citigroup, however, failed to comply with LSTC and Loomis' instructions and breached its obligations, including its duty of best execution.").)  Because best execution "affects the net price that investors pay or receive for securities" it is "widely understood as a subject of regulation under the Securities and Exchange Act of 1934 and related laws." *Kurz v. Fidelity Mgmt & Research Co.*, 556, F.3d 639, 640 (7th Cir. 2009).  Courts thus routinely dismiss best execution claims as precluded by SLUSA.  *See Rayner v. E*TRADE Fin.*

*Corp.*, 248 F. Supp. 3d 497, 503 (S.D.N.Y. 2017), *aff'd*, 899 F.3d 117 (2d Cir. 2018) (dismissing best execution claims alleging that trading platform used routing practices that resulted in less favorable execution prices); *Lim v. Charles Schwab & Co.*, No. 15-CV-02074-RS, 2015 WL 7996475, at *6 (N.D. Cal. Dec. 7, 2015), *aff'd sub nom.*, *Fleming v. Charles Schwab Corp.*, 878 F.3d 1146 (9th Cir. 2017) (same); *Lewis v. Scottrade, Inc.*, 204 F. Supp. 3d 1064, 1068 (E.D. Mo. 2016), *aff'd*, 879 F.3d 850 (8th Cir. 2018) (same).

*Second*, LSTC alleges that CGMI misrepresented the nature of the liquidity and imbalance analyses it would perform in relation to the orders for CL and SHOP. (*See* Compl. ¶ 48 ( "Citigroup failed to conduct an appropriate analysis of the liquidity that the market could bear in the closing auction"), ¶ 56 ("[A]ny reasonable analysis of liquidity and imbalance data would have revealed that the auction could not bear the full quantity of the orders").) However, as is evident from the March 18 Communications incorporated by reference into the Complaint, Mr. Chiomastro repeatedly told Loomis that CGMI would conduct liquidity and imbalance analyses. (*See* Ex. 1 at 2:49:59 p.m. ("Ill be monitoring imbalances in the others"), 2:55:43 p.m. ("I will let that sit for a bit and watch [CL and SHOP] for pairing off, counter flow"); Ex. 2 at 1:6–8 (confirming CGMI was "going to do some analysis" and "look to see [] the expected . . . Street trade . . . and what overlap we have"), 1:12–14 ("[W]e're going to first do the analysis to kind of see what the expected Street-side trade is and get a better picture of what the liquidity . . . is going to look like."), 2:19–21 ("[I]n terms of accessing true liquidity I think we're in a good spot and I will . . . keep an eye on SAM and CL in particular.").)

Indeed, Mr. Gagnon and Mr. Chiomastro were in near constant communication leading up to the 3:50 p.m. order cutoff, including extensive back and forth regarding the liquidity and imbalance analyses that LSTC erroneously alleges CGMI failed to undertake. (*See generally*

Exs. 1–3.)  At no point did Mr. Gagnon express any dissatisfaction or concern with Mr. Chiomastro's actions or proposed actions, or the information (or lack of information) he was communicating.  It follows that Loomis believes it was misled regarding the analyses CGMI was performing and reporting about in connection with the anticipated orders.  *See In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 572 (S.D.N.Y. 2012) ("Unless plaintiffs were misled by misrepresentations or by material omissions, it is impossible to understand why they would approve a merger that provided such lucrative management fees at plaintiffs' expense.").

LSTC's response, as previewed in its pre-motion letter, is apparently that those alleged misstatements by CGMI "occurred *after* it accepted the instructions" and thus CGMI "promised to conduct a liquidity analysis as part of its agreement to execute the orders" that had already been finalized.  (Dkt. No. 22 at 3 & n.1 (emphasis in original).)  That is disingenuous and utterly without merit, because the March 18 Communications clearly encompassed the discussions about the liquidity analyses, and the precise trading instructions for CGMI were not finalized until right before the 3:50 p.m. cutoff.  Just as LSTC's artful and misleading pleading—by disingenuously claiming the instructions were set in stone by 2:31 p.m. and ignoring all subsequent communications—cannot alter the terms of the actual instructions provided to CGMI (see *supra* § II.A), neither can it allow LSTC to run from the alleged misrepresentations and omissions that lie at the heart of its case and require dismissal under SLUSA.

*Miller v. Metropolitan Life Insurance Company* is instructive.  2019 WL 4450637, at *4 (S.D.N.Y. Sept. 17, 2019).  In *Miller*, the court dismissed under SLUSA claims brought by insureds that alleged they were misled into paying higher premiums because of a policy the insurer failed to disclose.  The court noted that the complaint "plainly allege[d] fraudulent conduct" because plaintiffs "allege[d] a misrepresentation concerning the method they expected

[the insurer] to use in calculating their premiums and the method [the insurer] used", and that plaintiffs' attempt to "artfully plead around that conduct by couching their claims as a breach of [the insurer's] discretion" was nonetheless barred by SLUSA. *Id.* This case is no different, as LSTC plainly alleges it was deceived by CGMI into placing orders that it would not have placed if Loomis had known the purported truth regarding liquidity and imbalances for CL and SHOP, and LSTC has attempted to "artfully plead around that conduct by couching [its] claims as a breach of [CGMI's] discretion" in executing the trades. *Id.*

*Third*, in addition to the misrepresentations LSTC alleges CGMI made regarding the analyses it was performing, LSTC explicitly alleges that CGMI withheld information that would have affected Loomis's instructions prior to the closing auction. Indeed, LSTC alleges that "*Citigroup was aware* that the quantities for the Affected Orders 'were bigger than [the] street' and would 'dominate the trade.'" (Compl. ¶ 52 (emphasis added).) The clear implication is that CGMI allegedly knew the requested transactions could not be executed without materially affecting the prices of CL and SHOP, but withheld that information, thereby inducing Loomis to instruct CGMI to place the orders anyway. *See Anwar v. Fairfield Greenwich Ltd.*, 151 F. Supp. 3d 390, 392 (S.D.N.Y. 2015) (claims based on alleged failure to disclose investment risk precluded by SLUSA); *Lewis*, 204 F. Supp. 3d at 1069 (dismissing best execution claims alleging defendant "failed to disclose that it was operating under a conflict of interest").[4]

---

[4] To be clear, any attempt by LSTC to make out a claim for securities fraud would fail, as, *inter alia*, the Complaint utterly fails to set forth any factual basis to conclude that the information CGMI shared with Loomis was inaccurate or that CGMI failed to disclose material facts to Loomis, let alone with the particularity required by the PSLRA. But for purposes of SLUSA, all that is required is that the substance of the claims asserted involves allegations of securities fraud, regardless of how lacking those allegations may be. As one court put it: "Whether Plaintiffs can succeed on the merits of their claims is not the test for SLUSA preemption. Indeed, the question before the court is not even whether Plaintiffs' allegation[s] state a claim for relief. SLUSA preemption depends, instead, on an examination of the complaint for allegations of 'an untrue statement or omission of a material fact [or deception] in connection with the purchase or sale of a covered security.'" *Gwin v. Nat'l Life Ins. Co.*, No. 2:08-CV-0059-RDP, 2008 WL 8945610, at *5 n.5 (N.D. Ala. Apr. 15, 2008) (citation omitted) (quoting SLUSA).

## IV. ALTERNATIVELY, LSTC'S FIDUCIARY DUTY CLAIM SHOULD BE DISMISSED AS DUPLICATIVE OF ITS CONTRACT CLAIM.

Even if LSTC has sufficiently pled that CGMI failed to comply with its duty of best execution (and we respectfully submit it has not), LSTC's fiduciary duty claim should be dismissed for the independent reason that it is duplicative of its contract claim. A claim alleging breach of fiduciary duty is duplicative of one alleging breach of contract when the claims are "identical in substance", meaning they are "premised upon the same facts and seek the same damages for the alleged conduct". *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 106 (S.D.N.Y. 2013); *see also Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 156 (S.D.N.Y. 2018) (citation omitted) ("[A] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand."). In other words, a fiduciary duty claim is "duplicative when it is based on allegations that are expressly raised in [the] [] contract claim." *N. Shipping Funds I*, 921 F. Supp. 2d at 105 (citation omitted).

Here, the fiduciary duty and contract claims are based on CGMI's alleged violation of the same duty—the duty of best execution of the trading instructions for CL and SHOP—and identical facts and circumstances. (*Compare* Compl. ¶¶ 71, 74 (alleging in contract claim that "Plaintiff . . . offered to have Citigroup . . . execute the Affected Order . . . in accordance with the accompanying instructions and Citigroup's duty of best execution and related standards") *with* ¶ 77 (alleging in fiduciary duty claim that CGMI "agreed to take on the discretion to decide how to execute the Affected Orders within the parameters delivered therewith, including discretion to determine the order type, size, timing, and price for the trades").)

To maintain both fiduciary duty and contract claims relating to the same conduct in the same action, the fiduciary duty claim must assert the "breach of an independent legal duty that 'spring[s] from circumstances extraneous to, and not constituting elements of, the contract'".

*Ambac*, 328 F. Supp. 3d at 156.  It is not enough to assert, as LSTC did in its pre-motion letter (*see* Dkt. No. 22 at 3), that a fiduciary relationship exists in addition to the contractual duty, where the alleged duties and breaches arise from the same facts.  *See Ambac*, 328 F. Supp. 3d at 156-57 (duties "'subsumed within the language of the [contracts] . . . or else implied within their terms,' [] cannot form the basis for a breach of fiduciary duty claim."); *Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 244 (S.D.N.Y. 2014) (where fiduciary duties at issue arose from nature of defendant's position, "[r]egardless of the source or existence of [the] duty, the critical issue is that the proposed 'breach of fiduciary duty claim is identical in substance to the breach of contract claim and is therefore duplicative.'") (quoting *N. Shipping Funds*, 921 F. Supp. 2d at 106).

Here, the communications that form the basis of the relevant contract—*i.e.*, Loomis's instructions to CGMI to place trades on its behalf—also establish the existence, extent, and nature of the alleged fiduciary relationship.  (Compl. ¶¶ 29-40.)  The same facts relating to the relevant instructions and orders are determinative of whether CGMI breached any contractual *or* fiduciary duty—there are no "extraneous circumstances" giving rise a fiduciary duty or breach thereof.  *See Barbara v. MarineMax, Inc.*, No. 12-CV-0368 ARR, 2012 WL 6025604, at *9 (E.D.N.Y. Dec. 4, 2012) ("If the breach of fiduciary duty claim [] arises from the duties imposed by the [contract], the claim is duplicative . . . and is therefore subject to dismissal."); *Ambac*, 328 F. Supp. 3d at 156–57 (dismissing duty of good faith claim incorporated by underlying contract, but not duty of loyalty claim that existed "separate and apart from" the memorialized terms).

## **CONCLUSION**

For the foregoing reasons, CGMI respectfully submits that LSTC's Complaint should be dismissed in its entirety, with prejudice, or, in the alternative, LSTC's fiduciary claim should be dismissed with prejudice.

Dated:  November 16, 2022

Respectfully submitted,

/s/ Michael A. Paskin

**CRAVATH, SWAINE & MOORE LLP**
Michael A. Paskin
Helam Gebremariam
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
mpaskin@cravath.com
hgebremariam@cravath.com

*Attorneys for Defendant Citigroup Global
Markets Inc.*