**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

LOOMIS SAYLES TRUST COMPANY, LLC, )
individually and on behalf of all others similarly )
situated, )
                                   )
        Plaintiff, )
                                   )       Civil Case No. 22-cv-6706-LGS
        v. )
                                   )
CITIGROUP GLOBAL MARKETS INC., )
                                   )
        Defendant. )
_____)

## PLAINTIFF LOOMIS SAYLES TRUST COMPANY, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT <u>CITIGROUP GLOBAL MARKETS INC.'S MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 2

LEGAL STANDARD ............................................................................................... 7

ARGUMENT ........................................................................................................... 8

    I.      THE COMPLAINT PLAUSIBLY ALLEGES CITIGROUP BREACHED CONTRACTUAL AND FIDUCIARY DUTIES TO LSTC AND THE CLASS...8

          A.    Citigroup's Unreasonable Interpretation of the Underlying Communications Cannot Be the Basis of Dismissal....................................8

          B.    The Complaint Plausibly Alleges That Loomis Instructed Citigroup to Use Its Discretion to Execute the Affected Orders, and Citigroup's Alternative Interpretation Is Contradicted by the Underlying Communications..........10

          C.    Citigroup Owed LSTC and the Class Contractual Duties and a Common Law Fiduciary Duty of Care, Including the Duty of Best Execution. .......12

          D.    The Complaint Plausibly Alleges That Citigroup Breached Its Contractual and Fiduciary Duties. ................................................................14

    II.     PLAINTIFF'S CLAIMS ARE NOT PRECLUDED BY SLUSA. .......................17

    III.    THE BREACH OF FIDUCIARY DUTY CLAIM IS NOT DUPLICATIVE OF THE BREACH OF CONTRACT CLAIM. ..........................................................23

CONCLUSION ....................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Cases**

*In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*,
   2021 U.S. Dist. LEXIS 188650 (S.D.N.Y. Sept. 30, 2021)......................................................8

*AMBAC Assurance Corp. v. United States Bank Nat'l Ass'n*,
   328 F. Supp. 3d 141 (S.D.N.Y. 2018)....................................................................................24

*Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Carnival PLC*,
   2022 U.S. Dist. LEXIS 173581 (S.D.N.Y. Sept. 26, 2022)....................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................................7

*De Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293 (2d Cir. 2002)..........................................................................................14, 23

*Fleming v. The Charles Schwab Corp.*,
   878 F.3d 1146 (9th Cir. 2017).............................................................................................20

*Forex Transactions Litig. v. Bank of N.Y. (In re Bank of N.Y. Mellon Corp.)*,
   921 F. Supp. 2d 56 (S.D.N.Y. 2013)....................................................................................14

*Grund v. Del. Charter Guar. & Tr. Co.*,
   788 F. Supp. 2d 226 (S.D.N.Y. 2011)..................................................................................17

*Gurfein v. Ameritrade, Inc.*,
   2006 U.S. Dist. LEXIS 75374 (S.D.N.Y. Oct. 13, 2006) .....................................................19

*Gurfein v. Ameritrade, Inc.*,
   2007 U.S. Dist. LEXIS 51801 (S.D.N.Y. July 17, 2007) .....................................................23

*Indep. Asset Mgmt. LLC v. Zanger*,
   538 F. Supp. 2d 704 (S.D.N.Y. 2008)..................................................................................24

*In re Kingate Mgmt. Litig.*,
   784 F.3d 128 (2d Cir. 2015)............................................................................................17, 23

*Lewis v. Scottrade, Inc.*,
   879 F.3d 850 (8th Cir. 2018). ...............................................................................................20

*Locus Techs. v. Honeywell Int'l Inc.*,
   2022 U.S. Dist. LEXIS 179349 (S.D.N.Y. Sept. 30, 2022)..................................................8, 9

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)..................................................................................................9

*Maniolos v. United States*,
741 F. Supp. 2d 555 (S.D.N.Y. 2010) .......................................................................8

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007) ......................................................................................7

*MDCM Holdings, Inc. v. Credit Suisse First Bos. Corp.*,
216 F. Supp. 2d 251 (S.D.N.Y. 2002) .....................................................................21

*Miller v. Metro. Life Ins. Co.*,
2019 U.S. Dist. LEXIS 159777 (S.D.N.Y. Sept. 17, 2019) .....................................20

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith*,
135 F.3d 266 (3d Cir. 1998) .............................................................................13, 14

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) .....................................................................................9

*N. Shipping Funds I, LLC v. Icon Cap. Corp.*,
921 F. Supp. 2d 94 (S.D.N.Y. 2013) .......................................................................25

*Paru v. Mut. of Am. Life Ins. Co.*,
2006 U.S. Dist. LEXIS 28125 (S.D.N.Y. May 11, 2006) ...........................17, 18, 22

*Press v. Chem. Inv. Servs. Corp.*,
166 F.3d 529 (2d Cir. 1999) ....................................................................................13

*Ramchandani v. CitiGroup, Inc.*,
Dkt. No. 1 (S.D.N.Y. Oct. 2, 2019) ...........................................................................9

*Rayner v. E\*Trade Fin. Corp.*,
899 F.3d 117 (2d Cir. 2018) .......................................................................17, 19, 20

*In re Refco Sec. Litig.*,
759 F. Supp. 2d 301 (S.D.N.Y. 2010) .....................................................................13

*Rhoda v. Rhoda*,
2017 U.S. Dist. LEXIS 105288 (S.D.N.Y. June 22, 2017) ...............................23, 24

*Rupnow v. E\*TRADE Sec., LLC*,
2021 U.S. Dist. LEXIS 235975 (S.D.N.Y. Dec. 9, 2021) ............................... *passim*

*Saboundjian v. Bank Audi*,
556 N.Y.S.2d 258 (App. Div. 1st Dept. 1990) ........................................................13

*Serdarevic v. Centex Homes, LLC*,
760 F. Supp. 2d 322 (S.D.N.Y. 2010) .......................................................................8

iii

*In re Stillwater Cap. Partners Inc. Litig.*,
    851 F. Supp. 2d 556 (S.D.N.Y. 2012).................................................................................17, 18

*United States v. Skelly*,
    442 F.3d 94 (2d Cir. 2006).........................................................................................................13

*United States v. Wolfson*,
    642 F.3d 293 (2d Cir. 2011).......................................................................................................13

*Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*,
    43 F. Supp. 3d 236 (S.D.N.Y. 2014)..........................................................................................25

*Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA), Inc.*,
    341 F. Supp. 2d 258 (S.D.N.Y. 2004)..............................................................................17, 18, 19

*Zurich Am. Life Ins. Co. v. Nagel*,
    538 F. Supp. 3d 396 (S.D.N.Y. 2021)...................................................................................23, 24

**Statutes & Releases**

Exchange Act Release No. 37619A (Sept. 6, 1996), 61 FR 48290, 48322 (Sept.
    12, 1996) ...............................................................................................................................13, 14

**Other Authorities**

FINRA Rule 5310 (2014) ...............................................................................................................14

Restatement (Second) of Agency, § 381.................................................................................12, 24

Citigroup's motion to dismiss remarkably seeks to rewrite the facts of this case in an effort to avoid responsibility for its egregious failures. Citigroup's purported facts are contrary to what the Complaint alleges and what the contemporaneous communications show. Citigroup's bid, therefore, must fail.

This case involves a large set of trades that Citigroup agreed to execute as broker for LSTC and the Class. The Complaint clearly alleges that Citigroup's mandate was to "exercise its discretion to execute the trades in a manner that did not materially impact the prices of the securities being traded, including its discretion as to the order type, size, timing and price for the trades" and that the trades did not need to be completed that day. Compl. ¶¶ 35-38. It further alleges that Citigroup breached its duty of best execution, placed the entirety of the orders into the closing auction, flooded the market, and caused tens of millions of dollars in losses. *Id.* ¶¶ 51-58. These allegations are based on the parties' contemporaneous communications.

Citigroup, however, ignores the Complaint's allegations, mischaracterizes the parties' communications, and injects its own, unsupported translation of technical trader jargon to assert that Citigroup lacked discretion. Citigroup asserts that the "true" instructions were for Citigroup to dump the entirety of the Affected Orders into the closing auction and that it, therefore, was simply executing as directed. Citigroup's construction of the record is not reasonable or persuasive, let alone conclusive, and must fail at this stage. Loomis never instructed Citigroup as it now claims, and, at all times, was clear that the discretion lay with Citigroup, the Affected Orders did not need to be completed the same day, and Citigroup should only execute the orders in a manner that did not materially impact price. The Complaint plausibly states claims for breach of contract and fiduciary duty based on Citigroup's actions before and during the closing auction.

1

Citigroup also incorrectly asserts that the claims are foreclosed by SLUSA. SLUSA only applies where the plaintiff's claims are based on allegations that the defendant made a material misrepresentation or employed a manipulative or deceptive device. Citigroup's contrived reading of the contemporaneous communications to identify a fraud claim that could have been alleged must fail. The communications do not support fraud and that is not what this case is about. LSTC's claims also do not require a material misrepresentation as a necessary component.

Finally, LSTC's breach of fiduciary duty claim arises from Citigroup's duties as broker and agent, which are independent of the specific terms of the parties' agreement. As such, this claim is not duplicative of LSTC's breach of contract claim.

The Court should reject Citigroup's improper effort to have its contrived factual interpretation govern on a motion to dismiss and deny the motion in its entirety.

## FACTUAL BACKGROUND

In March 2022, LSTC and Loomis, Sayles & Company, L.P. ("Loomis") undertook to rebalance the holdings in Loomis's Growth Equity Strategies ("GES") portfolios. Compl. ¶ 28. On March 18, Loomis and LSTC engaged Citigroup as broker to execute several large orders for the class. *Id.* ¶ 1. They looked to Citigroup's significant experience as a broker, both in trading on the New York Stock Exchange ("NYSE") and in handling large trade orders, *see id.* ¶ 24, as well as its familiarity with Loomis's GES portfolios, *see id.* ¶ 23.

March 18, 2022, known as a triple or quadruple "witching" day, was a day with considerably more liquidity than on typical trading days. *Id.* ¶ 27. Certain large indices were due to rebalance; stock index options and stock index futures were expiring in the open auction; and single stock options were expiring in the closing auction. *Id.* The closing auction is the final event of the trading day and is a single-price auction that matches orders at the price that maximizes the amount of tradeable stock. *Id.*

On March 18, 2022, LSTC and Loomis placed two "waves" of trade orders with Citigroup to execute as broker. *Id.* ¶ 29. Each order was accompanied by explicit and distinct instructions that were conveyed by Nicholas Gagnon, Loomis's Director and Head of Trading for GES, to Joseph Chiomastro, the primary Citigroup trader for equity orders in Loomis's GES portfolios. *Id.* ¶¶ 26, 29; Dkt. 37-1 at 2:18:03 p.m., 2:30:11 p.m.[1]

At 2:30 p.m., Gagnon placed the second wave of orders with Citigroup. Compl. ¶ 34; Dkt. 37-1 at 2:30:11 p.m. It is this second wave and Citigroup's handling of those orders that give rise to the damages in this case. The second wave included orders to buy 780,856 shares in Shopify, Inc. ("SHOP") and sell 5,236,139 shares in Colgate-Palmolive Company ("CL") (together, the "Affected Orders"). Compl. ¶ 34. The second wave was accompanied by instructions to Chiomastro to "wave out what you think is good for an aggressive MOC piece," "trade the rest best way," and "can be most aggressive near the close."[2] *Id.* ¶ 36. Gagnon explicitly stated that the orders in the second wave "*[d]o not have to be complete[d]*" the same day. *Id.* (emphasis added); Dkt. 37-1 at 2:30:11 p.m. As trade the rest "best way" indicates, these instructions included the directive that Citigroup use its discretion as an experienced broker to execute the trades in a manner that did not materially impact price. Compl. ¶ 35. This included Citigroup's discretion as to the order type, size, timing, and price for the trades, as well as discretion to use the variety of tools it

[1] In LSTC's view, the Complaint is wholly adequate, alone, to support denial of Citigroup's motion to dismiss. Use of the Bloomberg chat and call transcripts that Citigroup attached to its motion do not alter the conclusion that the motion should be denied. *See* Dkt. 37-1 to -3. For the Court's convenience, LSTC will cite to the exhibits attached by Citigroup (without conceding that the exhibits are true, correct, or complete transcripts of the chat and telephone calls) and does not agree to Citigroup's incorrect interpretation of those communications.

[2] "Near the close" means before the closing auction. *See* Compl. ¶ 39. These instructions provided via Bloomberg are in technical trader jargon. The Complaint provides allegations as to the meaning of these instructions, and Citigroup offers no appropriate basis to reject the Complaint's construction of these instructions or any other trader jargon in the underlying communications.

had available to it. *Id.* ¶¶ 35, 37. Through Chiomastro, Citigroup accepted the second wave of orders and the accompanying instructions. *Id.* ¶ 38.

After Gagnon placed the second wave of orders at 2:30 p.m. and relayed the details and instructions to Chiomastro on Bloomberg, he asked Chiomastro to "[g]ive [him] a call to confirm [these instructions] once ready." Dkt. 37-1 at 2:30:11 p.m. During that call, which began at 2:32 p.m., Chiomastro confirmed the instructions and acknowledged that he understood them. Specifically, Chiomastro made clear that he understood that he was to conduct the liquidity analyses to see what the market could bear and he preliminarily relayed that there would be "tons of liquidity" in the closing auction and that he would nevertheless "do the analysis" to get a better picture of that liquidity. Dkt. 37-2 at 2. He further stated, "once we do that analysis . . . we'll have a better picture of . . . how we're going to slice this out." *Id.* at 2-3. While Chiomastro expressed his hope that "we can do all of it on the close," he confirmed his understanding that the orders "do not need to be done" that day. *Id.*

The communications make clear that Chiomastro understood that Citigroup had the discretion to decide how and when to place the trades based on the liquidity that it discerned. Towards the end of the 2:32 p.m. call, Chiomastro confirmed that as to the second wave, "we're not going to work anything early" unless Citigroup had "an order on the other side." *Id.* at 3-4. Gagnon responded that "we definitely wouldn't complain" if "you got something in CL or SAM early." *Id.* at 4. Gagnon then confirmed that, the "other stuff um, yeah, *it's your discretion*." *Id.* (emphasis added). Chiomastro responded: "Perfect." *Id.*

From then until the closing, Chiomastro provided Loomis with periodic updates via Bloomberg. The first of these messages contained a chart accompanied by the text "[e]xpected street trade." Dkt. 37-1 at 2:49:19 p.m. Twenty seconds later, Chiomastro informed Loomis that

he had placed four of the nine securities in the second wave "down all MOC already," and that he would "be monitoring imbalances in the others but expect to get most done as discussed." *Id.* at 2:49:40 p.m. As this update demonstrates, Chiomastro understood that Citigroup had discretion and did not need further instructions, beyond those given to him at 2:30 p.m., to decide how and when to place the trades.

From 2:49 p.m. to 3:22 p.m., the chat was entirely one-sided, with Chiomastro sending updates to Loomis regarding his work on the trades, and Loomis providing no response. For example, at 3:11 p.m., Chiomastro sent a chart comparing the size of the orders to the "[e]xpected street trade." accompanied by a message that the chart "[r]eiterate[d] [their] chat re SAM." *Id.* at 3:11:10 p.m. At 3:22 p.m., Chiomastro shared that SLB "ke[pt] pairing," so he decided to put SLB "all MOC." *Id.* 3:15:15 p.m. – 3:15:38 p.m.; 3:22:08 p.m. These updates reflect Chiomastro's understanding of his authority to act using his discretion, without the need for additional permissions from Loomis. Nothing in the correspondence suggests that the original instructions to Citigroup, including that it use its discretion, changed.

At 3:22 p.m., Loomis's Daniel Maturi sent a message alerting Chiomastro that Loomis was going to add to both waves of orders. *Id.* at 3:22:34 p.m. Chiomastro responded: "Are they same instru[ctions]?" *Id.* at 3:23:22 p.m. After the additions to the first wave had been transmitted, Maturi confirmed that the instructions remained the same as those provided around 2:18 p.m. *Id.* at 3:26:09. And, after the additions to the second wave were transmitted, Gagnon confirmed the instructions remained the same as those provided around 2:30 p.m. for the shares added to the second wave. *Id.* at 3:41:51 p.m. – 3:42:15 p.m. ("Same instruction all.").

At 3:31 p.m., Gagnon and Chiomastro spoke by phone for the first time since their call an hour earlier. Chiomastro said it was "still very early," and he was calling to get Gagnon's thoughts

on a LOC level in the event that Chiomastro had not yet decided to place all the orders "around kinda the last few minutes." Dkt. 37-3 at 2. Gagnon asked, "how many are you thinking you'll use . . . LOC?", again demonstrating that Citigroup was setting the course in its discretion. *Id.* Chiomastro replied that he was "hoping" just CL and SAM, though he still had CL, SAM, SHOP, and ADP "in hand." *Id.* at 3. Chiomastro did not inquire about LOC levels for the remaining securities.

As to CL, Gagnon, consistent with the instructions that Citigroup had discretion and did not need to be done that day, asked, "what percent do you think you'll be done, um, excluding whatever we have to do, limit on close?" *Id.* Chiomastro responded that it was "tough to say right now," but that he would give Gagnon a call back in 15 minutes "with a little bit more guidance on kinda where we are." *Id.* Gagnon replied that he saw some buyers in CL, so he was "thinking it's gonna be fine."[3] *Id.* Near the conclusion of the call, Chiomastro stated that he did "think that CL we just end up being down there all MOC, we don't probably even need an LOC." *Id.* He then stated that he would call Gagnon back in ten minutes. *Id.* at 3-4. To this final logistical note from Chiomastro, Gagnon replied, "[t]hat sounds perfect." *Id.* at 4. Chiomastro did not, however, call back.

As to SHOP, Chiomastro provided an update via Bloomberg at 3:44 p.m.—*i.e.*, six minutes before the closing auction cutoff—regarding an imbalance of 440,000 shares "to buy" in SHOP, with 40,000 shares paired off. Dkt. 37-1 at 3:44:03 p.m. He also noted that "I have 346k SHOP in hand," and "[t]he rest is MOC." *Id.* at 3:44:14 p.m. – 3:44:18 p.m. Four minutes later, Gagnon asked Chiomastro a question: "looking to complete all except maybe SAM?" *Id.* at 3:48:50 p.m. At the time he asked this question, Gagnon was aware he had instructed Chiomastro to be

---

[3] It is not clear what "fine" modifies in Gagnon's statement; the preceding discussion does not include a statement from either speaker that all CL orders will be placed as MOC.

"aggressive near the close," Compl. ¶ 36; that Chiomastro was of the view that there was plenty of liquidity, *see, e.g.*, Dkt. 37-2 at 2; and that Chiomastro's last position on SHOP before the close was that he had "346k SHOP in hand," Dkt. 37-1 at 3:44:14 p.m., indicating he had not placed those shares into the closing auction. Just thirty seconds before the final auction began, Chiomastro answered, "yes" to Gagnon's question. Dkt. 37-1 at 3:49:29 p.m. A minute later, Chiomastro informed Loomis that he "ha[d] all down now MOC x SAM." *Id.* at 3:50:26.

Chiomastro's actions flooded the market. Compl. ¶ 1. Yet neither he nor anyone else at Citigroup took any corrective action. *Id.* Citigroup made no attempt to cancel or reduce the size of the Affected Orders pursuant to NYSE rules, and it failed to involve the NYSE and/or the Designated Market Maker ("DMM") to suspend the auction to address the extreme order imbalance that Citigroup caused. *Id.* ¶¶ 1, 59-60.

By placing the entirety of the Affected Orders as MOC orders—and doing so in part just seconds before the cutoff time for the closing auction—Citigroup caused artificial price dislocation which resulted in execution at inflated prices. *Id.* ¶ 1. Citigroup purchased the entire volume of SHOP at a price that spiked significantly (by nearly $100 per share) as a result of Citigroup's failed execution, causing over $60 million in needless losses. *Id.* ¶ 54. It also placed the entire volume of CL into the closing auction, causing the price to drop, and resulting in over $10 million in needless losses. *Id.* ¶ 55.

## LEGAL STANDARD

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss, the court must accept the plaintiff's allegations as true and make all reasonable inferences in its favor. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). Where the claims require contract interpretation, the court resolves any

ambiguities regarding interpretation in the plaintiff's favor. *Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Carnival PLC*, 2022 U.S. Dist. LEXIS 173581, at *7 (S.D.N.Y. Sept. 26, 2022). Consistent with these principles, courts deny motions to dismiss where the parties present competing interpretations of the contractual terms at issue. *See, e.g.*, *Locus Techs. v. Honeywell Int'l Inc.*, 2022 U.S. Dist. LEXIS 179349, at *19 (S.D.N.Y. Sept. 30, 2022); *In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, 2021 U.S. Dist. LEXIS 188650, at *52 (S.D.N.Y. Sept. 30, 2021) (declining to delineate the scope of contractual obligations because, at the pleading stage, "the parties have not had the opportunity to brief their arguments as to the meaning of . . . th[e]se terms in the context of their agreement"); *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 333 (S.D.N.Y. 2010); *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010).

Citigroup's motion to dismiss violates all of these precepts and asks this Court to ignore the allegations in the Complaint and misconstrue the contemporaneous communications in its favor to escape responsibility for its failures.

## ARGUMENT

I. **THE COMPLAINT PLAUSIBLY ALLEGES CITIGROUP BREACHED CONTRACTUAL AND FIDUCIARY DUTIES TO LSTC AND THE CLASS.**

    A. **Citigroup's Unreasonable Interpretation of the Underlying Communications Cannot Be the Basis of Dismissal.**

Citigroup argues that it did not breach any contractual or fiduciary duties because all it had to do, and all it did, was follow a purported instruction by Loomis to place the entirety of the Affected Orders as MOC orders. Citigroup's argument must fail because it hinges on the Court accepting its improper and inaccurate construction of contemporaneous communications. LSTC's Complaint presents a reasonable interpretation of the contemporaneous instructions provided to Citigroup in connection with the Affected Orders and plausibly alleges that those instructions included that Citigroup use its discretion in executing the orders. Compl. ¶¶ 35-36. That discretion

gave rise to certain obligations, including to make reasonable judgements on how to execute based on Citigroup's experience, its access to information, and its duty of best execution. The Complaint alleges that Citigroup failed those obligations.

Citigroup, however, introduces a competing view on the meaning of the contemporaneous communications and the instructions for the Affected Orders. While consideration of the communications at this stage is not foreclosed, Citigroup's desire to dispense with the Complaint and have its unilateral construction serve as the basis for dismissal must be rejected. *See Locus Techs.*, 2022 U.S. Dist. LEXIS 179349, at *19.

*First*, the parties do not agree about "whether and how" the post-2:30 p.m. chats and calls "relate[] to the contractual relationship." *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 235 (2d Cir. 2016). *Second*, while LSTC does not contest the accuracy of the transcripts for the purpose of this motion, it vehemently contests the accuracy of Citigroup's *interpretation* of those transcripts. In contriving its own version of the events, Citigroup relies on a host of disputed facts, trader jargon, and a selective and misleading recitation of the communications (despite accusing LSTC of doing the same). Citigroup is well aware that trader jargon often requires translation by experts intimately familiar with the industry, and such translations are critical.[4] As such, the Court should not accept Citigroup's unilateral interpretation of the communications. It is not the Court's "task at [the pleadings] stage to construe . . . abundant industry jargon . . . in any definitive fashion." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 175-76 (2d Cir. 2015).

---

[4] In a 2019 lawsuit filed against Citigroup, a former trader alleged that his manager at Citigroup misleadingly "decoded" technical trader jargon in chat communications for the U.S. Department of Justice ("DOJ") in a manner that falsely implicated him and led to his indictment for antitrust violations. *See Ramchandani v. CitiGroup, Inc.*, Dkt. 1 (S.D.N.Y. Oct. 2, 2019). The DOJ acknowledged that, since the "communications in the chatroom were often filled with dense jargon, describing highly technical trading strategies that were frequently conveyed in shorthand[,] DOJ investigators were, on their own account, . . . simply unable to understand the meaning of many of the chatroom communications themselves." *Id.* ¶ 167.

**B.** **The Complaint Plausibly Alleges That Loomis Instructed Citigroup to Use Its Discretion to Execute the Affected Orders, and Citigroup's Alternative Interpretation Is Contradicted by the Underlying Communications.**

The Complaint's allegations that Loomis instructed Citigroup to exercise its discretion, including "as to the order type, size, timing and price for the trades," to execute the trades in a manner that did not materially impact price, Compl. ¶ 35, are consistent with and supported by the contemporaneous communications. Loomis expressly instructed Citigroup to "wave out what you think is good for an aggressive MOC piece," "trade the rest best way," and "can be most aggressive near the close." *Id.* ¶ 36. Loomis also instructed that the Affected Orders "[did] not have to be complete[d]." *Id.* ¶¶ 1, 35-36, 40. The Bloomberg chats and call transcripts confirm that Citigroup had wide discretion in executing the trades and belie Citigroup's interpretation. Perhaps most telling is the exchange at the end of the 2:32 p.m. telephone call, in which Gagnon expressly confirmed that the decision to "work [the orders] early" was in Chiomastro's "discretion," to which Chiomastro responded, "[p]erfect." Dkt. 37-2 at 5. The few subsequent questions from Gagnon to Chiomastro were just that—questions about whether and how Chiomastro, in his discretion, was intending to execute the orders. *See* Dkt. 37-3 at 2 ("[H]ow many are you thinking you'll use . . . LOC?"); *id.* at 3 ("CL what percent do you think you'll be done . . . ?"); Dkt. 37-1 at 3:48:50 p.m. ("And looking to complete all except maybe SAM?").

A fair reading of the underlying communications belies the interpretation advanced by Defendant. *First*, Citigroup's position that Gagnon instructed it to proceed with MOC orders for the entirety of the Affected Orders rests on several mischaracterizations of the communications advanced by Defendant. *See* Dkt. 36 at 10. For example, as to CL, Citigroup contends that, in a phone call with Chiomastro, "Mr. Gagnon concluded it would be 'fine' to place the CL orders as MOC." *Id.* at 13. Citigroup's assertion that Gagnon reached or communicated a "conclusion" is inaccurate, for at least two reasons: (1) Gagnon actually says, "[s]o I'm thinking it's gonna be

10

fine," conveying far less certainty and authority than Citigroup suggests, and (2) the preceding discussion does not include a statement from either speaker that all CL orders will be placed as MOC. Instead, Gagnon asks a question—"CL what percent do you think you'll be done, um, excluding whatever we have to do, limit on close?"—suggesting an understanding that at least some CL was likely to be placed as LOC. Dkt. 37-3 at 3. Citigroup also suggests that Gagnon's reply of "[t]hat sounds perfect," *id.* at 4, responds to, and immediately follows, the comment from Chiomastro that, "I do think that CL we just end up being down there all MOC." Dkt. 36 at 8, 13. Citigroup's characterization is plain wrong. It omits more than *six lines* of text between Chiomastro's comment and Gagnon's reply. The reasonable reading of this exchange is that Gagnon's reply of "[t]hat sounds perfect" was directed at this final logistical note from Chiomastro, "maybe I'll give you a call back in 10 minutes," rather than to the prior comments on CL.

As to SHOP, Citigroup contends that right before the close of trading, Gagnon issued a "directive" that Chiomastro "'complete all' of the trades." Dkt. 36 at 13. Citigroup omits a critical question mark. Gagnon *asked* Chiomastro, "looking to complete all except maybe SAM?" Dkt. 37-1 at 3:48:50 p.m. Gagnon was asking Chiomastro what he intended to do, not instructing him to take this course of action.[5] This was by no means a "directive" that Chiomastro "complete all" of the trades, as Citigroup contends. Dkt. 36 at 13.

*Second*, the communications refute Citigroup's assertion that instructions were provided to Citigroup "throughout the day" on March 18. *Id.* at 2. To the contrary, they confirm Chiomastro's understanding that, unless Loomis expressly stated otherwise, the initial instructions stood. When

---

[5] Citigroup's interpretation of "looking to complete all" assumes that the phrase is synonymous with placing the entire order MOC in the closing auction. It is not. It was possible to "complete" an order without placing the entirety of that order into the closing auction including, for example, by executing some volume before the auction.

Maturi told Chiomastro that he would "have some add ons" to both waves of orders, Chiomastro responded, "[a]re they same instru[ctions]?" Dkt. 37-1 at 3:22:34 p.m. – 3:26:16 p.m.; 3:42:51 p.m. – 3:42:15 p.m. This demonstrated that Chiomastro understood the initial instructions as to both waves remained binding. Citigroup's assertion that it was in "constant communication regarding how Loomis wanted [Citigroup] to execute the second wave of trades" is similarly not accurate. Dkt. 36 at 13. Gagnon and Chiomastro spoke by phone at 2:32 p.m., just after the second wave of orders, and did not speak on the phone again until nearly an hour (or, according to Chiomastro, nearly a "lifetime") later, at 3:31 p.m. Dkt. 37-2 at 5.

Chiomastro's intermittent communications with Loomis via Bloomberg reflect a few unilateral updates regarding the orders. That Chiomastro provided updates is not surprising given Gagnon's request that Chiomastro "just let [Loomis] know how it's going," nor does it change the substantive instructions provided at the outset. *Id.* at 3. This request was consistent with Chiomastro's duty as agent "to use reasonable efforts to give his principal information relevant to the affairs entrusted to him and which, as the agent has notice, the principal would desire to have." Restatement (Second) of Agency, § 381.[6]

### C. Citigroup Owed LSTC and the Class Contractual Duties and a Common Law Fiduciary Duty of Care, Including the Duty of Best Execution.

The Complaint alleges that Citigroup owed contractual duties arising from the instructions provided by Loomis as well as common law fiduciary duties as broker and agent. The contractual duties included that Citigroup exercise its reasonable discretion to execute the orders in a manner that would not materially impact price. Moreover, as an implied term of the contract or an

---

[6] The delineation of responsibilities between Loomis and Citigroup was entirely consistent with their principal-agent relationship. Citigroup is a global broker with significant experience trading on the NYSE and handling large orders. Compl. ¶ 24. Loomis is not. It is, therefore, reasonable to infer that Loomis chose to hire Citigroup because of its superior experience and access to information, and that Loomis sought to leverage Citigroup's strengths by directing it to execute in the best way using its discretion.

independent obligation arising from Citigroup's role as agent (or both), Citigroup owed the duty of best execution. Compl. ¶¶ 40-41. As described by the SEC, "[a] broker-dealer's duty of best execution derives from common law agency principles and fiduciary obligations . . . . This duty of best execution requires a broker-dealer to seek the most favorable terms reasonably available under the circumstances for a customer's transaction." Exchange Act Release No. 37619A (Sept. 6, 1996), 61 FR 48290, 48322 (Sept. 12, 1996); *see also Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F.3d 266, 270 (3d Cir. 1998).

Citigroup, however, argues that it did not owe LSTC the duty of best execution because it "did not have 'discretionary trading authority'" over the accounts and that its "only duty" was "the proper execution of transactions upon explicit customer instructions." Dkt. 36 at 18. Citigroup relies on two cases unrelated to the duty of best execution. *See In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 323 (S.D.N.Y. 2010); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999). The cases cited by Citigroup merely stand for the unremarkable proposition that "the fiduciary obligation that arises between a broker and a customer as a matter of New York common law is limited to matters relevant to affairs entrusted to the broker." *Press*, 166 F.3d at 536; *accord In re Refco Sec. Litig.*, 759 F. Supp. 2d at 323 (citation omitted).

As alleged, Loomis entrusted Citigroup with the discretion to execute the orders in a manner that would not materially impact the price. Compl. ¶¶ 1, 35-37. Citigroup thus owed a fiduciary duty, including the duty of best execution, in connection with the Affected Orders. *Id.* ¶¶ 77-78. As the Second Circuit has recognized, "particular factual circumstances may serve to create a fiduciary duty between a broker and his customer *even in the absence of a discretionary account.*" *United States v. Wolfson*, 642 F.3d 293, 295 (2d Cir. 2011) (emphasis in original) (quoting *United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006)); *see also Saboundjian v. Bank*

*Audi*, 556 N.Y.S.2d 258, 259 (App. Div. 1st Dept. 1990) ("The relationship between a customer and his stockbroker is that of principal and agent; the duty owed by the stockbroker is that of a fiduciary."); *De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002) ("On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders . . . .").

In apparent recognition of its duty of best execution, Citigroup attempts to limit the duty to "select[ing] the most favorable venue for a customer's trades." Dkt. 36 at 17. But the duty of best execution is not so narrow. FINRA Rule 5310, cited both in the Complaint and by Citigroup as giving shape to the duty of best execution, provides that members "shall use reasonable diligence to ascertain the best market for the subject security *and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions*." FINRA, Rule 5310 (2014) (emphasis added); *see also Forex Transactions Litig. v. Bank of N.Y. (In re Bank of N.Y. Mellon Corp.)*, 921 F. Supp. 2d 56, 76 (S.D.N.Y. 2013); Exchange Act Release No. 37619A (Sept. 6, 1996), 61 FR 48290, 48322 (Sept. 12, 1996); *Newton*, 135 F.3d at 270. Therefore, the duty of best execution includes not only the duty to ascertain the best market, but also to buy or sell in that market in such a way so as to achieve the most favorable price possible under the circumstances.

### D. The Complaint Plausibly Alleges That Citigroup Breached Its Contractual and Fiduciary Duties.

The Complaint contains detailed allegations concerning the several ways that Citigroup breached its duties to LSTC and the Class. *See* Compl. ¶¶ 56-60, 78; *see also id.* ¶¶ 48-49. Citigroup asserts that it did not breach its duties because (1) it conducted an analysis of liquidity and imbalance data; (2) it could not have corrected any Legitimate Error under the NYSE rules; and (3) it could not or need not have taken any of the other available measures alleged in the

Complaint. Because the Complaint, taken (as it must) as true, makes plausible allegations in each of these respects, Citigroup's arguments fail.

*First*, the Complaint alleges that Citigroup failed to conduct an appropriate analysis of the volume that the market could bear in the closing auction for SHOP and CL without materially affecting price, and that it further failed to monitor and react appropriately to the order imbalances. Citigroup contends that it did conduct an analysis of liquidity and imbalance data and that it relayed the information to Loomis. Dkt. 36 at 14. The "liquidity analysis" to which Citigroup refers is the chart of "street" trades transmitted by Chiomastro at 3:11 p.m. (an earlier version of which he transmitted at 2:49 p.m.) *Id.* It is not clear what, if any, import these numbers actually had on Chiomastro's trading decisions or how these figures related, if at all, to liquidity at closing auction. Nor is there any assertion that Citigroup analyzed liquidity at any time after 3:11 p.m. as the closing auction grew near. Citigroup was required to appropriately and reasonably analyze liquidity on an ongoing basis over the course of trading, including in the minutes leading into the closing auction, to determine the type, size, and price of the orders to place at the 3:50 p.m. cutoff time for the closing auction. Compl. ¶¶ 1, 39, 48, 56. Citigroup failed to do so. The single blurb at 3:11 p.m. in no way establishes that Citigroup satisfied its obligations.

The same is true of Citigroup's obligations to monitor imbalance data. While Citigroup claims that Chiomastro "monitored the imbalance data," including for SHOP at 3:44 p.m., it cannot overcome LSTC's allegation that it failed to adequately monitor and react to imbalance data, including after 3:50 p.m. *Id.* ¶¶ 49, 56, 59. Citigroup provides no support for its contention that reporting imbalance data at a single moment in time satisfied its obligations or justified dumping the entirety of the Affected Orders into the closing auction immediately before the cutoff time. *Id.* ¶ 50; *see also* Dkt. 37-1 at 3:49:29 p.m. – 3:50:26 p.m. This is particularly true given that

imbalances "might exist at the Close more quickly." Dkt. 37-4 at 2. Citigroup's only response is to claim that Gagnon "received and digested" the imbalance data and "subsequently decided to proceed with MOC orders for the full CL and SHOP orders." Dkt. 36 at 14-15. But, as explained above, Citigroup's central contention that Gagnon instructed Chiomastro to place the entirety of the Affected Orders as MOC orders fails. *See supra* Point I.B. Accordingly, Citigroup's claim that it conducted a reasonable analysis of liquidity and imbalance data should be rejected.

*Second*, the Complaint alleges that Citigroup could have avoided the losses by making use of the NYSE rule that permits cancellation or modification of orders in cases of "legitimate error." Compl. ¶ 59. Citigroup claims that "[t]here was no error to be corrected," repeating its fabrication that Loomis instructed Chiomastro to place the entirety of the Affected Orders as MOC orders. Citigroup makes the conclusory assertion that the error alleged—*i.e.*, an error "in analyzing the appropriate number of shares to enter into the closing auction"—is not the "sort of 'legitimate error'" in "number of shares" contemplated by the NYSE Rules. Dkt. 36 at 15-16. The Complaint alleges to the contrary, and at this stage, without any evidence regarding the scope of the NYSE rule, Plaintiff's allegation prevails.

*Third*, the Complaint alleges that Citigroup failed to take other available measures to avoid losses. Citigroup claims that "[t]he Complaint makes no allegation about why the obligation was on [Citigroup] to contact NYSE or the DMM," *id.* at 16. However, the Complaint specifically alleges that Citigroup, "as a matter of its duty," should have attempted to take steps to remediate its failing, including, for example, "utilizing its on-floor trading staff and/or contacting the NYSE on-floor ramp and other staff, and/or involved the Designated Market Maker to suspend the auction for dislocation, call for more liquidity, and/or cancel orders in the auction." Compl. ¶ 60.

Citigroup's motion should be denied.

## II.    PLAINTIFF'S CLAIMS ARE NOT PRECLUDED BY SLUSA.

Citigroup next argues that the case should be dismissed because it is, in its view, a fraud case precluded by SLUSA. It is not. SLUSA only precludes claims where the plaintiff alleges that the defendant made "'a misrepresentation or omission of a material fact' or 'used or employed any manipulative or deceptive device or contrivance.'" *Rayner v. E\*Trade Fin. Corp.*, 899 F.3d 117, 119-20 (2d Cir. 2018). Courts in the Second Circuit have held that a complaint alleges a material misrepresentation for purposes of SLUSA when it alleges "an explicit claim of fraud or misrepresentation" or claims that "sound in fraud." *In re Stillwater Cap. Partners Inc. Litig.*, 851 F. Supp. 2d 556, 568-69 (S.D.N.Y. 2012) (citations omitted). "If the allegation is extraneous to the complaint's theory of liability, it cannot be the basis for SLUSA preclusion." *In re Kingate Mgmt. Litig.*, 784 F.3d 128, 142-43 (2d Cir. 2015).

While courts "look beyond the face of the complaint to analyze the substance of the allegations made," the central question for SLUSA is whether the purported misrepresentation is a "necessary component of the claim." *Stillwater*, 851 F. Supp. 2d at 568-69; *see also Grund v. Del. Charter Guar. & Tr. Co.*, 788 F. Supp. 2d 226, 241 (S.D.N.Y. 2011); *Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA), Inc.*, 341 F. Supp. 2d 258, 266 (S.D.N.Y. 2004). Just as a plaintiff may not escape SLUSA by so-called "artful pleading," a defendant may not escape liability by recasting the plaintiff's Complaint as a securities fraud so as to have it precluded. *Rupnow v. E\*TRADE Sec., LLC*, 2021 U.S. Dist. LEXIS 235975, at \*9 (S.D.N.Y. Dec. 9, 2021) (quoting *Paru v. Mut. of Am. Life Ins. Co.*, 2006 U.S. Dist. LEXIS 28125, at \*4 (S.D.N.Y. May 11, 2006)).

Here, the Complaint does not allege fraud, nor is misrepresentation a necessary component of the claims. LSTC alleges that Citigroup breached its contract as to the second wave orders, which included the binding instructions provided at 2:30 p.m. requiring Citigroup to use its discretion to determine a reasonable volume to place as MOC orders without materially impacting

price, place the rest of the orders in the best way possible, and provide best execution. Compl. ¶¶ 23-24, 34-42, 70-74; Dkt. 37-1 at 2:30:11 p.m. The Complaint further alleges that, as a broker and agent, Citigroup owed Plaintiff a fiduciary duty of care, which it failed to discharge by placing the entirety of the Affected Orders as MOC orders and then by failing to take any remedial actions despite the fact that there was inadequate liquidity in the market. *Id.* ¶¶ 77-79.

SLUSA is inapplicable where, as here, a plaintiff makes contract and duty-based claims that do not require showing fraudulent conduct on the part of the defendant. *See, e.g.*, *Stillwater*, 851 F. Supp. 2d at 556; *Rupnow*, 2021 U.S. Dist. LEXIS 235975, at *10-15; *Paru*, 2006 U.S. Dist. LEXIS 28125, at *9-11. Claims for breach of contract "generally fall outside the scope of the securities laws, because failing to carry out a promise made in connection with a securities transaction . . . does not [constitute fraud] unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." *Stillwater*, 851 F. Supp. 2d at 573 (emphasis added).

*Rupnow v. E\*TRADE Sec., LLC* is on point. 2021 U.S. Dist. LEXIS 235975, at *13. There, the court rejected defendant's argument that plaintiff's breach of contract claim alleging that E\*TRADE failed to disclose certain costs was a "disguised" misrepresentation claim because "Plaintiffs [did] not allege that E\*TRADE intended not to perform the Agreement." *Xpedior Creditor Trust* is also illustrative. 341 F. Supp. 2d at 269. There, the court held that breach of contract and fiduciary duty claims were not precluded by SLUSA where the plaintiff alleged only that the defendant "acted contrary to its express and implied duties" and made no "allegations about [defendant's] mental state" at the time that the parties entered into the contract, and the claims required "no evidence of [defendant's] mental state at all." *Id.*

Here, LSTC asserts only that Citigroup violated its "express and implied duties" under the parties' agreement and other duties based on its fiduciary role as broker. Like in *Rupnow* and *Xpedior Creditor Trust*, nowhere has LSTC alleged that, at the time Citigroup accepted the Affected Orders and took on the role of broker, it held some secret intention not to perform or knew it would be unable to do so. Nor do the underlying communications suggest such intention, inability, or other bad faith. To succeed on its claims in this case, LSTC need only show that Citigroup failed to carry out its contractual and fiduciary obligations; it need not delve into the mental state underlying Citigroup's conduct. No material misrepresentation serves as a necessary component to Plaintiff's straightforward breach of contract and fiduciary duty claims. *See Gurfein v. Ameritrade, Inc.*, 2006 U.S. Dist. LEXIS 75374, at *3 (S.D.N.Y. Oct. 13, 2006). Accordingly, SLUSA preclusion is not appropriate.

Rather than contend with the "necessary component" standard in this Circuit, Citigroup ignores the relevant framework altogether and relies instead on out-of-jurisdiction cases that are readily distinguishable. In so doing, Citigroup offers its own purported allegations based on its selective and misleading interpretation of the underlying communications.

Citigroup claims that courts "routinely dismiss best execution claims as precluded by SLUSA," without any explanation of the substance of those claims or how they are similar (or not) to the claims at issue here. Each of the best execution cases Citigroup relies on are, however, distinguishable from this case and inapposite to deciding this motion. *Rayner v. E*Trade Fin. Corp.*, the only Second Circuit case that Citigroup cites in support of its argument, involves allegations of a kickback scheme whereby the defendant made misrepresentations regarding best execution "that were designed to induce [its] clients" while secretly holding a conflict of interest. 899 F.3d at 120. Here, unlike in *Rayner*, LSTC does not allege that any statements by Citigroup

induced it to enter into the agreement as to the Affected Orders or that Citigroup was engaged in any kickback scheme, held any secret conflict of interest preventing it from performing, or had undisclosed intentions not to perform. Indeed, *Rayner* was subsequently distinguished in *Rupnow* on similar grounds. 2021 U.S. Dist. LEXIS 235975, at *13 (explaining that *Rayner* "involved a defendant who allegedly had no intention of fulfilling its purported fiduciary obligations" (internal quotation marks omitted)). In *Rupnow*, as in this case, plaintiffs did not allege that the defendant "secretly intended not to perform or knew that [it] could not perform" and, therefore, SLUSA did not apply. *Id.*

Citigroup's reliance on out-of-jurisdiction cases fares no better. In *Fleming v. The Charles Schwab Corp.*, the substance of the allegations was that the defendant, again motivated by a conflict of interest, was engaged in a "deceptive scheme" whereby it "deceived" plaintiff that it would deliver best execution but knew that it would not do so because of its conflicting arrangement for financial payments. 878 F.3d 1146, 1154 (9th Cir. 2017). Citigroup also fails to mention that the Ninth Circuit in *Fleming* made clear that "not every breach of the best execution duty . . . is [] subject to the SLUSA bar. . . . SLUSA only bars best execution claims to the extent that a best execution violation is based on fraud or nondisclosure.'" *Id.* (citations omitted). In *Lewis v. Scottrade, Inc.*, the plaintiff alleged that Scottrade violated best execution by directing nearly all customer orders to a particular trading venue in order to "maximize kickback revenue." 879 F.3d 850, 854 (8th Cir. 2018). As in *Rayner*, the courts in *Fleming* and *Lewis* focused on allegations involving defendants motivated by secret conflicts of interest incompatible with the duty of best execution. That is not the case here.[7]

---

[7] *Miller v. Metro. Life Ins. Co.* is simply off base. 2019 U.S. Dist. LEXIS 159777 (S.D.N.Y. Sept. 17, 2019). Not only did this opinion not address fiduciary duty claims, but also, there, plaintiffs alleged that they were induced to pay excessive premiums because of defendant's "deceptive practice" of defaulting to smoker status upon enrollment. In this case, there are no allegations of deception.

The remainder of Defendant's arguments rely on its re-writing of the Complaint and mischaracterizations of the underlying communications, which is entirely inappropriate on a motion to dismiss and without merit. *See MDCM Holdings, Inc. v. Credit Suisse First Bos. Corp.*, 216 F. Supp. 2d 251, 257 n.12 (S.D.N.Y. 2002) ("Because the determination of whether SLUSA applies may only be made by reference to what a party has alleged, and not what it could have alleged, courts should be wary of a defendant's attempts to recast the plaintiff's complaint as a securities lawsuit in order to have it preempted by SLUSA."). *First*, Citigroup recasts LSTC's breach of contract count as a claim that "CGMI misrepresented that it would execute the second wave of trades on the terms Loomis provided, and therefore in accordance with its alleged duty of best execution." Dkt. 36 at 20. This is not the case; LSTC has not and does not allege that Citigroup misrepresented its intention to carry out the orders as instructed when it accepted them. Rather, as described above, LSTC alleges that Citigroup agreed to carry out the Affected Orders consistent with the instructions provided, and then failed to do so. Citigroup's manipulation of the underlying communications does not alter the nature of Plaintiff's allegations.

*Second*, Citigroup claims that "the precise trading instructions for CGMI were not finalized until right before the 3:50 p.m. cutoff." *Id.* at 22. Defendant offers no support for its position that its unilateral (and incorrect) interpretation of the underlying communications should govern at the pleading stage or its contention as to when the trading instructions were "finalized." As explained above, Citigroup's position as to the final instructions is contradicted by Chiomastro's confirmation that the supplemental orders were governed by "the same instructions" provided at 2:30 p.m. Dkt. 37-1 at 3:22:34 p.m. – 3:23:22 p.m. Citigroup's attempt to manipulate and misinterpret the underlying communications in order to achieve SLUSA preclusion is

impermissible and should be rejected. *Paru*, 2006 U.S. Dist. LEXIS 28125, at *4; *see also Rupnow*, 2021 U.S. Dist. LEXIS 235975, at *9.

*Third*, Citigroup attempts to turn statements made by Chiomastro *after* Loomis provided the instructions and placed the orders with Citigroup into a misrepresentation that purportedly (and inexplicably) induced those same orders. Again, Defendant's interpretation is without merit and should be rejected. Chiomastro's statements made after Citigroup's acceptance of the orders were largely in the form of unilateral updates and do not form the basis of the parties' agreement as alleged in the Complaint or the basis of LSTC's claims. *See supra* Point I.B. While these statements by Chiomastro may provide evidence that Citigroup was aware of some steps needed to carry out the instructions and its related obligations as broker, they are not misrepresentations that serve as a "necessary component" of LSTC's claims. Indeed, had Chiomastro never made such statements and Citigroup placed the entirety of the Affected Orders in the closing action as it did, LSTC's claims would remain unchanged. Citigroup then makes a conclusory leap that because Gagnon did not "express any dissatisfaction or concern" in response to Chiomastro, Loomis must believe it was misled. This conclusion is wrong as a matter of logic and fact.

*Fourth*, Citigroup argues that "LSTC explicitly alleges that CGMI withheld information that would have affected Loomis's instructions prior to the closing auction." Dkt. 36 at 23. Yet again, this argument relies on Citigroup's unilateral conclusions, contrary to the Complaint and the record, that there were no final instructions until the closing auction. LSTC alleges that after it placed the orders and instructions with Citigroup, triggering Citigroup's obligations, and before Citigroup entered the MOC orders, Citigroup became "aware that the quantities for the Affected Orders 'were bigger than [the] street' and would 'dominate the trade.'" Compl. ¶ 52. This allegation demonstrates the egregious nature of Defendant's failure. It is not a misrepresentation

that induced LSTC to place the orders with Citigroup, nor does it serve as a necessary component of the claims. This singular, extraneous allegation could be entirely removed and have no impact on LSTC's claims. *See In re Kingate Mgmt. Litig.*, 784 F.3d at 142-43. For the foregoing reasons, LSTC's claims are not foreclosed by SLUSA.

### III. THE BREACH OF FIDUCIARY DUTY CLAIM IS NOT DUPLICATIVE OF THE BREACH OF CONTRACT CLAIM.

In the final two pages of its brief, Citigroup asserts that the fiduciary duty claim is duplicative of the contract claim. Dkt. 36 at 24. This argument fails. A fiduciary duty claim should not be dismissed as duplicative where the duties at issue are independent of the terms of the contract. *Rhoda v. Rhoda*, 2017 U.S. Dist. LEXIS 105288, at *57 (S.D.N.Y. June 22, 2017). Here, the fiduciary duty claim arises from Citigroup's duties as broker and agent, independent of the terms of the parties' agreement.

Courts have frequently recognized that agents, including, for example, employees and managers, have independent fiduciary duties that remain alongside any express contractual duties. *See, e.g.*, *id.* (finding that business manager had common law fiduciary duties that did not necessarily arise from the employment contract); *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 403 (S.D.N.Y. 2021) ("[E]mployees owe fiduciary duties to their employers, independent of any contractual duties."). It is well-established that brokers, as agents, owe common law fiduciary duties to their principals, independent of any contract. *See, e.g.*, *De Kwiatkowski*, 306 F.3d at 1302 ("On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale."); *Gurfein v. Ameritrade, Inc*, 2007 U.S. Dist. LEXIS 51801, at *9-10 (S.D.N.Y. July 17, 2007) ("Ameritrade is under an independent duty to make reasonable efforts to provide best execution, arising from common law agency principles

23

which require broker-dealers 'to use reasonable efforts to maximize the economic benefit to the client in each transaction.'"); Restatement (Second) of Agency, § 381.

As this Court explained in *AMBAC Assurance Corp. v. United States Bank National Association*, "[i]t is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by the contract but which is independent of the contract itself." 328 F. Supp. 3d 141, 156 (S.D.N.Y. 2018). This rule has particular force where the precise contours of the contractual duties at issue have not yet been determined. *See, e.g.*, *Zurich Am. Life Ins. Co.*, 538 F. Supp. 3d at 403 (holding that breach of fiduciary duty claim was not duplicative of breach of contract claim); *see also Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704, 710 n.4 (S.D.N.Y. 2008) ("It would be especially inappropriate to dismiss the claim founded on fiduciary duty . . . [on a motion to dismiss], when the exact duties of the parties under the contract have not yet been determined.").

Here, the precise terms of the parties' agreement are very much in dispute. LSTC alleges that the parties' agreement as to the Affected Orders required Citigroup to both abide by the express instructions communicated around 2:30 p.m., and also impliedly required Citigroup to provide best execution. LSTC also alleges that, regardless of the ultimate contours of the parties' agreement, Citigroup, as broker, owed it a fiduciary duty of care, including the duty of best execution and the duty to exercise reasonable diligence. Compl. ¶¶ 76-79. Where, as here, a defendant owes a common law fiduciary duty that may not be subsumed in the terms of the agreement, the fiduciary duty claim is not duplicative. *Rhoda*, 2017 U.S. Dist. LEXIS 105288, at *55-57; *see also AMBAC Assurance Corp.*, 328 F. Supp. 3d at 157.

The cases Citigroup relies on are distinguishable and do not support dismissal of LSTC's fiduciary duty claim. *First*, Citigroup relies extensively upon *AMBAC Assurance Corp.*, 328 F.

Supp. 3d at 141. In that case, the court concluded that common law "fiduciary duties of undivided loyalty exist[ed] separate and apart from the . . . duties memorialized in" the written agreements at issue, and, therefore, declined to dismiss those claims as duplicative. *Id.* at 156 (internal quotation marks and citations omitted). *Second*, Citigroup's reliance on *Northern Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94 (S.D.N.Y. 2013), is misplaced. In that case, unlike in the present matter, the plaintiff did not allege that the defendant had a common law fiduciary duty apart from the parties' written contract. *Id.* at 104-05.[8]

Citigroup argues that, because the communications forming the relevant contract "also establish the existence, extent, and nature of the fiduciary relationship," the fiduciary duty claim must be duplicative. This is incorrect. Citigroup's common law fiduciary duty was established based on its role as agent and broker, and independent of the contractual undertaking. If, for example, Loomis had merely sent an electronic trade order to Citigroup without the communications at issue here, Citigroup would still be Loomis's broker and agent and would have the associated duties of agency at common law. Here, the communications provide additional information on the scope of that agency relationship, but they do not solely give rise to Citigroup's duties. Accordingly, LSTC's fiduciary duty claim is independent of its breach of contract claim and neither should be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Citigroup's motion to dismiss.

---

[8] Citigroup also cites *Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*, which is of no relevance here. 43 F. Supp. 3d 236 (S.D.N.Y. 2014). In that case, "[n]o defendant moved to dismiss any claim" and, more importantly, it was undisputed that the plaintiff's breach of fiduciary duty claim was "duplicative of [its] proposed breach of contract claim." *Id.* at 241-42.

Respectfully submitted,

LOOMIS SAYLES TRUST COMPANY, LLC

By its attorneys,

/s/ Matthew C. Baltay

Matthew C. Baltay (pro hac vice)
Dean Richlin (pro hac vice)
Stephen P. Younger
Leah S. Rizkallah
Natalie F. Panariello (pro hac vice)

FOLEY HOAG LLP

155 Seaport Blvd.
Boston, MA 02210
1301 Avenue of the Americas, 25th Floor
New York, NY 10019

Dated: December 9, 2022