

155 Seaport Blvd.
Boston, MA 02210
617.832.1000 main

Matthew C. Baltay
617-832-1262
mbaltay@foleyhoag.com

February 17, 2023

Hon. Lorna G. Schofield
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse, 40 Foley Square
New York, NY 10007

Re: *Loomis Sayles Trust Company, LLC v. Citigroup Global Markets Inc.*, 22-cv-6706-LGS

Dear Judge Schofield:

  Plaintiff Loomis Sayles Trust Company, LLC ("LSTC") hereby submits this letter brief regarding Citigroup's as-converted motion for summary judgment. This Court should deny the motion because material issues of fact exist or defer its consideration pursuant to Rule 56(d) (*see* LSTC's R. 56(d) Ltr. (Dkt. 52)). In order to protect its rights, and in light of the Court's directive that the parties submit materials on the as-converted motion notwithstanding the Rule 56(d) issue (Dkt. 53), LSTC submitted evidence pertinent to the as-converted motion (LSTC also submitted the Declaration of K. Leonetti listing facts still needed to resolve Citigroup's premature motion).

  It is critical to start with the parties' actual agreement with respect to the second wave of trades as that places everything into context. Citigroup agrees that the Court should view matters "in full and holistically" and "in context" and Citigroup even submits information from March 9 for context. Dkt. 43 at 4, 5; Dkt. 63-1, -2, -3.[1] The evidence shows the instructions Gagnon provided to Citigroup at 2:30 pm on March 18 formed the basis of the contract and set its terms: to "wave out what you think is good for an aggressive MOC piece," "trade the rest best way," "can be most aggressive near the close," and "[d]o not have to be complete[d]" that day. Gagnon Decl., Ex. D (Dkt. 58-4) at 2:30 – 2:31 pm. The *applicability* of those instructions to the Affected Orders is unambiguous. However, discerning the *meaning* of those terms requires extrinsic evidence, including on the trade jargon and industry custom and usage, which may be considered even absent ambiguity. *Rose Stone & Concrete, Inc. v. Cnty. of Broome*, 76 A.D.2d 998, 998 (App. Div. 3d Dep't 1980) ("[T]rade terms may be shown by parol evidence."). LSTC has provided preliminary evidence regarding the meaning of those terms through Loomis's co-heads of trading and industry experts. Gagnon Decl. ¶¶11-20; Maturi Decl. (Dkt. 61) ¶¶25, 33-35; Estella Decl. (Dkt. 60) ¶¶9-11, 21-30; Rutigliano Decl. (Dkt. 62) ¶¶8-10. Each witness makes clear that the meaning of those terms within the industry, and the resulting agreement, is that Citigroup agreed to exercise its discretion to execute the trades in a manner that did not materially impact the prices of the securities being traded. *Id*. That evidence is undisputed.

---

[1] Citigroup's positioning is inconsistent. It resists LSTC's request to put the full context into the record and focuses on the snippet from 3:48 pm while simultaneously charging that it is LSTC that is "presenting a grossly incomplete and misleading picture" of matters (Dkt. 43 at 5) and asking the Court to consider additional materials but only those that it proffers (such as the March 9 communications Citigroup just filed).

The record confirms that Citigroup operated under the terms of the agreement formed at 2:30 pm all afternoon. Citigroup repeatedly reported out as to what it had been doing in its discretion and entered orders without seeking further clearance from Loomis. Thus, by 2:49 pm, Citigroup, based on the 2:30 instructions, had unilaterally submitted four of the second wave orders entirely as MOC orders. Gagnon Decl., Ex. D at 2:49 pm ("DOCS, PYPL, SQ, VEEV I have down all MOC already"). And by 3:22 pm, it had decided that SLB was "going all MOC." *Id.* at 3:22. Chiomastro did not ask permission to submit those orders; rather he provided an update after he had done so. As Loomis's experts have opined, this is because Citigroup was to exercise **its** discretion in deciding how best to trade the securities. Estella Decl. ¶¶9-11, 21-30; Rutigliano Decl. ¶¶8-10, 15-25. The record further reflects that Citigroup was conducting analyses based on the 2:30 pm instruction (*e.g.*, Gagnon Decl., Ex. D at 2:55, 3:11, 3:15 pm, Ex. F at 1:2-3), consistent with the conclusion that Citigroup had the obligation to assess liquidity and use its judgment to execute. Citigroup points to an exchange at 3:31 pm, focusing on Gagnon's statement, "thinking [CL]'s gonna be fine." Dkt. 36 at 13. This was not a superseding or binding instruction and cannot be divorced from the context of the 2:30 pm instructions. Gagnon Decl. ¶¶27-28. Gagnon made this statement based on his understanding that Citigroup had already determined, in its discretion, the portion of the CL order to place MOC, and meant that Citigroup could access liquidity ahead of the closing auction for the remaining shares, consistent with the original instruction. *Id.* Gagnon did not mean the closing auction could absorb the entire CL order. *Id.* At 3:42 pm, the original agreement is clearly still in place as Loomis sent a supplemental order to the second wave under the same instructions ("Same instruction[s] all"), which Citigroup acknowledged ("ty"), further confirming that at least as of 3:42 pm, the original instructions governed and remained in force. Gagnon Decl., Ex. D at 2:42 pm. Citigroup's 3:44 pm statement that "[t]he rest is MOC" must also be read in context of the immediately preceding Citigroup statement: "I have 346k SHOP in hand," which is trade talk meaning that 346k shares of SHOP had not yet been traded in regular trading (or placed into the closing auction). Gagnon Decl. ¶30.

Citigroup seeks to upend this entire back and forth by arguing (with no factual support) that the 3:48 pm chat somehow changed Loomis' original instructions. Even if this was consistent with any facts Citigroup advances (and it is not), that is a question of fact for the jury. *Deutsche Asset Mgmt. v. Callaghan*, 2004 U.S. Dist. LEXIS 5945, at *53 (S.D.N.Y. Apr. 7, 2004) ("[J]ust as the question whether the parties intended to form a contract is a question of fact, so is the question whether the parties' conduct expresses an intention to modify an existing agreement."). In any event, the 3:48 pm question "looking to complete all except maybe SAM?" must be read in the context of what the preexisting agreement was and what transpired that afternoon, namely that Citigroup had execution discretion, and the parties were discussing its progress. During the 3:31 pm call, Chiomastro said that he had shares of four names left to trade but thought he would use a conditional LOC order only for SAM and "maybe" CL, implying that he expected to complete the rest. Gagnon Decl., Ex. F (Dkt. 58-6) at 2:10. This context is critical. As Gagnon explains, he was "acknowledging Mr. Chiomastro's update regarding SHOP ('Thanks') and asking for a further update regarding the other orders." *Id.* ¶31. He was not giving an instruction to place all of SHOP and CL as MOC orders. *Id.* ¶32. Indeed, there were numerous ways after 3:48 pm that Citigroup could have completed all the orders without entering them MOC. Rutigliano Decl. ¶¶27-30; Gagnon Decl. ¶¶18, 31-32. Nowhere in that exchange does Gagnon mention "MOC." No amount of argument can convert this question into an instruction that supersedes all that came before it. There is no evidence (only argument) that Citigroup understood this question as a binding instruction, let alone undisputed fact.

At worst, the 3:48 pm chat is open to two interpretations: (1) it was a question asking about Citigroup's progress; or (2) it was the "final and express directive" (Dkt. 43 at 5). As such, it is ambiguous, and extrinsic evidence is needed (aside from context and translation of trade jargon). *Memnon v. Clifford Chance*, 667 F. Supp. 2d 334, 348 (S.D.N.Y. 2009) ("[W]hen the terms of the contract are susceptible to more than one reasonable meaning, a court may consult parol evidence to determine the parties' intent."). Extrinsic evidence is also permissible for the separate reason that the agreement is far from integrated. *Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 213 (S.D.N.Y. 2003). LSTC has adduced evidence supporting the conclusion that this was in fact a question and not a final and express directive. Gagnon Decl. ¶¶31-32; Estella Decl. ¶¶29-30; *see also* Maturi Decl. ¶¶12, 37-39.

Citigroup's own admissions after market close on March 18 are entitled to great weight. *Disney Enters. V. Finanz St. Honore, B.V.*, 2016 U.S. Dist. LEXIS 169322, at *18 (E.D.N.Y. Dec. 5, 2016) ("Where a contract is ambiguous, the practical interpretation of a contract by the parties manifested by their conduct subsequent to its formation for any considerable length of time before it becomes a subject of controversy, is entitled to great, if not controlling, weight in the construction of the contract."); *T.L.C. W., LLC v. Fashion Outlets of Niagara, LLC*, 60 A.D.3d 1422, 1424 (4th Dep't 2009) (same). In an internal recorded call made just after the events in question, Chiomastro and two Citigroup executives candidly admitted that (1) Citigroup, not Loomis, decided to place the Affected Orders as MOC (Speaker 1: ███████ ███████ Speaker 2: ███████ (2) ███████ and (3) ███████ Leonetti Decl., Ex. A. They further admit that ███████ ███████ *Id*. The tenor of the conversation is revealing. (We suggest that the Court listen to the audio, which we have submitted.)

Citigroup's focus on the update, "I have all down now MOC x SAM" is also unavailing. Chiomastro made this statement at **3:50 pm**, <u>**after**</u> the cutoff for withdrawals from the auction absent legitimate error. And Gagnon did not understand this statement to mean that Chiomastro had placed the entirety of the orders except SAM as MOC orders into the closing auction. Gagnon Decl. ¶33. It is fanciful to suggest that Citigroup's statement after the closing auction cutoff converted Gagnon's question into a directive. Rather, this statement by Citigroup is further proof that the exercise of discretion by Citigroup, and not the instructions of Loomis, determined how and when the trades were placed. Estella Decl. ¶30.

Finally, independent of the precise meaning of the March 18 Communications, Citigroup acting as broker and agent (by its own admission) owed LSTC a fiduciary duty to carry out its work with diligence and competence, which includes the duty of best execution. *U.S. v. Wolfson*, 642 F.3d 293, 295 (2d Cir. 2011). In publicly available statements, Citigroup admits it owes the duty of best execution "in any transaction," regardless of the level of discretion, which includes "the requirement to take all sufficient steps with the goal of obtaining the best possible result for Clients." Estella Decl., Ex. B at 11; Ex. C at 4. Citigroup cannot side-step that duty.

Summary judgment should be denied on both claims. LSTC requests oral argument.

Hon. Lorna G. Schofield
Page 4

                                                Respectfully submitted,

                                                */s/* Matthew C. Baltay

cc:    Counsel of Record (via ECF)