# CRAVATH

Michael A. Paskin
mpaskin@cravath.com
T+1-212-474-1760
New York

February 17, 2023

*Loomis Sayles Trust Company, LLC v. Citigroup Global Markets Inc.*, No. 1:22-cv-6706-LGS

Dear Judge Schofield:

> Defendant Citigroup Global Markets Inc. ("CGMI") submits this letter brief in response to the Court's February 10, 2023 Order.

## I.    There is no genuine dispute of material fact that Loomis instructed CGMI to place MOC orders for CL and SHOP.

> The March 18 Communications are unambiguous and, read in their entirety, show Loomis's instructions were to place MOC orders for CL and SHOP.  (*See, e.g.*, Dkt. 36 ("MTD") at 6-8, 12-14; Dkt. 43 ("Reply") at 4-7.)  LSTC's argument that the Court should disregard the communications between 2:32 and the close because the agreement was set in stone based on chat messages in the minute between 2:30 and 2:31 p.m. is frivolous and should be rejected outright.  As CGMI argued in its Reply, LSTC's interpretation makes little sense, as it would have the Court ignore the later-in-time communications where Loomis and CGMI discussed how to execute the orders.  (*See* Reply at 4-7.)  For example, following the initial discussions at 2:30-2:31 p.m., Messrs. Gagnon and Chiomastro went back and forth about whether to use a limit order for SAM, and at what price.  In fact, Mr. Gagnon did not give his final instruction on what limit price to use for SAM until 3:54 p.m., after Mr. Chiomastro confirmed he had placed the rest of the orders MOC pursuant to Mr. Gagnon's instructions.  (*See* MTD at 15; Reply at 5.)

> In contrast to SAM, there was no discussion of a specific limit for any of the other stocks in the second basket, including CL (for which the possibility of an LOC order was discussed and rejected) and SHOP (for which an LOC order was *never* discussed at all).  But under Plaintiff's interpretation, the extensive discussions about a limit order for SAM and about considering options and deciding to place the remaining orders MOC was academic and had no bearing on what instructions were provided by Loomis to CGMI.  According to LSTC, CGMI had unfettered discretion to place whatever types of orders with whatever limitations or lack thereof for all the stocks.  Why the extensive communications from Loomis as to how the trades should be executed if that were the case?  LSTC's interpretation is untethered to the parties' extensive and unambiguous communications between 2:32 p.m. and the close of trading.  Rather, the only reasonable interpretation is that Loomis instructed CGMI to place an LOC order for SAM with a limit price of $401, and to place MOC orders for all the other stocks, including CL and SHOP.

**NEW YORK**
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
T+1-212-474-1000
F+1-212-474-3700

**LONDON**
CityPoint
One Ropemaker Street
London EC2Y 9HR
T+44-20-7453-1000
F+44-20-7860-1150

**WASHINGTON, D.C.**
1601 K Street NW
Washington, D.C. 20006-1682
T+1-202-869-7700
F+1-202-869-7600

CRAVATH, SWAINE & MOORE LLP

**II.      There is no genuine dispute of material fact as it relates to CGMI's ability to cancel or modify the orders, or suspend trading after the cutoff time.**

The Complaint alleges that CGMI should have canceled or modified the orders after 3:50 p.m. due to a "legitimate error". (Dkt. 1 ("Compl.") ¶ 59.) However, the relevant NYSE rule applies only to "an error in any term of an order, such as price, number of shares, side of the transaction (buy or sell), or identification of the security", none of which applies here. (Dkt. 37-4.) Moreover, it would have made no sense for CGMI to make changes that contradicted Loomis's instructions. (*See* MTD at 15.) The Complaint also alleges that CGMI should have requested that the DMM suspend trading. (Compl. ¶ 60.) But NYSE Rule 7.35(j) explicitly provides that only the DMM may request such a suspension. (*See* MTD at 16; Dkt. 37-4.) LSTC's opposition brief ignores Rule 7.35(j), and repeats the Complaint's allegations that "Citigroup failed to take other available measures to avoid losses". (Dkt. 42 at 16.) Those allegations were deficient on a motion to dismiss (*see* Reply at 8-9), and are even more so now, where LSTC "cannot rely on the 'mere allegations or denials' contained in the pleadings" to create a fact dispute. *ICC Chem. Corp. v. Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 21016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

**III.      While the additional contextual evidence submitted by CGMI is not necessary for the Court to interpret the parties' agreement, it provides further support for CGMI's interpretation and undermines LSTC's.**

The March 18 Communications speak for themselves, and the Court can interpret them as a matter of law. Nevertheless, because the Court invited the parties to submit additional evidence, CGMI has submitted exhibits reflecting additional communications between Loomis and CGMI from both before and after the March 18 Communications. While these communications are not part of the parties' agreement and are not necessary to interpreting it, they do provide relevant context that accords with CGMI's interpretation and undermines LSTC's.

*First*, Bloomberg chats between Loomis and CGMI on March 9, 2022, show that Mr. Gagnon, Loomis's Director and Head of Trading for Growth Equity Strategies, reached out to CGMI in advance of March 18 to relay his thoughts about how best to "be there" to capture liquidity on witching day and not miss out on opportunities as Loomis had in the past. (Dkt. 63-1 at 1:20:29-1:25:46 p.m.) In that conversation, Mr. Gagnon specifically asked about limit orders (*see id.* at 1:15:42 p.m.), showing that he was well aware of that option. As further demonstrated by his instructions for SAM on March 18, Mr. Gagnon knew how to instruct CGMI to use a limit when he wanted one, but no such instruction was given for CL or SHOP.

*Second*, Defendant submitted transcripts of three telephone calls shortly after the close on March 18 between Loomis and Mr. Chiomastro. Tellingly, these calls—the direct communications between the parties closest in time after the market close—were not among the torrent of supplemental materials filed yesterday by LSTC. While those calls clearly reflect surprise and disappointment by Loomis about the closing prices, the Loomis individuals did not tell Mr. Chiomastro that he should have unilaterally exercised discretion to place different orders for CL, SHOP or any other stock. (Dkts. 63-7–63-9.) Rather, Mr. Gagnon contemporaneously reflected that "in hindsight" limit orders may have been preferable: "[W]e should have been participating with a . . . tight limit . . . . Like, that last hour *we* probably should have been like reduce, reduce, reduce". (*See* Dkt. 63-7 at 1:20-2:5 (emphasis added).) Critically, Mr. Gagnon's reference to what "we" "should have been" doing during "that last hour" shows he understood that he had still been providing instructions to Mr. Chiomastro during that time. That directly contradicts LSTC's interpretation that the trading instructions were finalized by

2:31 p.m., exposing it as a made-for-litigation argument in an effort to convince the Court to ignore the parts of Loomis's actual instructions to CGMI that are fatal to LSTC's case.

### IV.   The additional evidence submitted by LSTC is irrelevant, self-serving and unpersuasive, and fails to raise a genuine dispute of material fact.

In a last-ditch effort to manufacture a fact dispute where none exists, Plaintiff submitted five declarations that seek to confuse the issues and persuade the Court that the March 18 Communications are ambiguous and cannot be interpreted as a matter of law.  As CGMI has previously explained, notwithstanding their informal nature and the presence of some acronyms and jargon, the March 18 Communications unambiguously reflect Loomis's instructions that CGMI place MOC orders for CL and SHOP.  (*See* MTD at 11-15; Reply at 3.)

Nevertheless, Plaintiff's purported "evidence" is also easily revealed as self-serving and unpersuasive, and it does not give rise to a material fact dispute over the meaning of the parties' agreement.  The declarations of Messrs. Gagnon and Maturi merely parrot Plaintiff's incredible interpretation of the March 18 Communications.  Arguing that Mr. Chiomastro had discretion, Mr. Gagnon quotes the same excerpts described in the Complaint.  (*See, e.g.*, Dkt. 58 ¶ 16.)  And where Mr. Gagnon attempts to engage with the later-in-time chats, his explanations are frivolous and contrary to the plain meaning of the contemporaneous communications.  For example, Mr. Gagnon now states that the phrase "*all* down now MOC x SAM" did not refer to "all" of the requested quantities but rather an "appropriate" amount.  (*Id.* ¶ 33.)  No reasonable fact-finder would accept such an ex-post explanation that runs counter to the plain meaning of Mr. Gagnon's words as expressed in the real-time communications and the full context of his back and forth with Mr. Chiomastro.  The Loomis declarations also offer hindsight opinions that have no bearing on the meaning of the parties' agreement, such as Mr. Maturi's statement that he was "shocked" to find out that MOC orders were placed. (Dkt. 61 ¶ 36.)  The Court should disregard those declarations.  *See, e.g.*, *Walker v.* Carter, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) ("[A] nonmoving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment.").

Plaintiffs' purported expert declarations should likewise be disregarded. (Dkts. 60, 62.)  The Court does not need expert testimony—or any other extrinsic evidence—to interpret the March 18 Communications.  *See, e.g.*, *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11078(LTS)(AJP), 2010 WL 3239416, at *4 (S.D.N.Y. Aug. 16, 2010).  In any event, the declarations largely do not provide expert opinions.  For example, Mr. Estella, a former equity trader, opines that "looking to complete all except maybe SAM?" is a "question not an instruction".  (Dkt. 60 ¶¶ 3, 29.)  Surely, the Court can interpret those words without the aid of Plaintiff's retained experts.

Finally, Plaintiff's counsel submitted a declaration attaching as an exhibit an internal CGMI phone call from shortly after the close on March 18.[1]  (Dkts. 56, 56-1.)  That call, which includes CGMI employees uninvolved in the execution of the trades, has no bearing on the agreement between Loomis and CGMI, which is encompassed by the March 18 Communications and can be interpreted by the Court as a matter of law.

---

[1] Mr. Leonetti's declaration also argues more discovery is necessary to interpret the agreement and that the Court should therefore delay resolution of Defendant's motion.  (Dkt. 56 ¶¶ 6-17.)  As explained in CGMI's February 16, 2023 letter (Dkt. 54), any such extrinsic and expert evidence is unnecessary because the parties' agreement is unambiguous and should be interpreted by the Court as a matter of law.

Respectfully submitted,

/s/ Michael A. Paskin

Michael A. Paskin

The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

VIA ECF

Copies to:

FOLEY HOAG LLP
Matthew C. Baltay (*pro hac vice*)
Dean Richlin (*pro hac vice*)
Kenneth S. Leonetti
Leah S. Rizkallah
Natalie F. Panariello (*pro hac vice*)

mbaltay@foleyhoag.com
drichlin@foleyhoag.com
ksl@foleyhoag.com
lrizkallah@foleyhoag.com
npanariello@foleyhoag.com